STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Gary A. JOHNSON,
Defendant-Appellant.

Supreme Court

*No. 2005AP573–CR. Oral argument September 13, 2006.
—Decided March 21, 2007.*

2007 WI 32

(Also reported in 729 N.W.2d 182.)

676

678

For the plaintiff-appellant-petitioner there were briefs by *Mark A. Neuser* and *Sally L. Wellman,* assistant attorneys general, with whom on the briefs was *Peggy A. Lautenschlager,* attorney general, and there was oral argument by *Sally L. Wellman.*

For the defendant-appellant there was a brief and oral argument by *Eileen A. Hirsch,* assistant state public defender.

¶ 1. LOUIS B. BUTLER, JR., J. The State seeks review of a published decision of the court of appeals reversing a judgment of conviction against Gary A. Johnson for possession of cocaine with intent to deliver in violation of Wis. Stat. § 961.41(1m)(cm)1r. (2003–04).[1] Johnson contends the circuit court erred in denying his motion to suppress contraband seized during a protective search of his vehicle and his person following a traffic stop. Because we conclude the search was not justified by specific, articulable facts supporting a reasonable suspicion that Johnson posed a threat to the officers' safety or that of others, we affirm the decision of the court of appeals.

I

¶ 2. The following facts are undisputed and taken from testimony given at the hearing on Johnson's suppression motion. On November 2, 2003, City of Racine Police Officer Chad Stillman stopped a 1989 black Cadillac and discovered that the car's registration had been suspended for an emissions violation. Because

---

[1] All references are to the 2003–04 version of the statutes unless otherwise noted.

the driver[2] was not the person to whom the car was registered, Stillman did not issue a citation for the emissions violation at that time. Late in the afternoon of November 5, 2003, Stillman spotted the car again while on squad patrol with Officer Michael Dummer. The officers followed the vehicle for a short distance when Dummer observed it fail to signal for a turn.

¶ 3. The officers stopped the car with the squad car's emergency lights and siren engaged. It was dark, but the area was illuminated by street lamps. The officers observed two persons in the car. Officer Dummer testified that he saw the driver of the car, later identified as Gary Johnson, "lean forward, which appeared to be reaching underneath his front seat." On cross-examination, Dummer confirmed that he could not see Johnson's hands but stated that the driver's head was "pretty close" to disappearing from view. Officer Stillman testified that he "observed [Johnson] make a strong furtive movement bending down as if he was reaching ... underneath the seat. ..." Stillman confirmed that he saw a portion of Johnson's head and shoulders disappear from view. Stillman later stated that "[t]he furtive movement was under the seat, his head and shoulders disappearing." Both officers testified that, in light of their experience and training, they believed that Johnson's movement was consistent with an attempt to conceal contraband or weapons.

¶ 4. The officers approached the car. Stillman advised Johnson that he was being stopped for an emissions violation. Johnson provided Stillman with paperwork indicating that the emissions problem had been corrected. Stillman was satisfied that the paperwork was "adequate" to show "that the vehicle had passed emissions within the past couple days so that

[2] Gary Johnson was not driving the vehicle on November 2.

those circumstances were cleared up." Stillman did not ask Johnson about the hidden movement that he and Dummer had observed Johnson make earlier.

¶ 5. Stillman asked Johnson to step out of the car. Johnson complied and told Stillman that he had a bad leg. Stillman informed Johnson he was being asked to exit the car because of Johnson's movement inside the car after he pulled over. Dummer testified that Johnson was asked to step out of the car "just for officer safety, not knowing what maybe he had been reaching for to either grab or to put down thinking it could possibly be a weapon that could injure us." Neither officer had had any prior police contact with Johnson.

¶ 6. Dummer testified that "once [Johnson] was towards the back of the vehicle, Officer Stillman advised him that he was going to do a pat down for weapons just for our safety." Dummer testified that when Stillman reached Johnson's left pant leg during the pat down, Johnson fell to the ground. Johnson told the officers that he felt pain in that area. The officers helped him up, and Stillman attempted to resume patting down Johnson's left pant leg, but Johnson again fell to the ground. Stillman testified that when the officers did the weapons pat down Johnson "acted like he fell down. He didn't completely make it to the ground because I had held him up, but yes, he did fall down, or attempted to." Dummer testified that he and Stillman then "helped [Johnson] over to the curb and just had him sit . . . hoping that that would ease his leg."

¶ 7. Stillman asked Johnson if there was anything illegal in the car. According to Dummer, "Stillman advised Mr. Johnson due to his movements that we were going to search the vehicle," and Johnson responded, " 'I don't have a problem with that.' " Both officers indicated that they intended to search the vehicle with or without Johnson's assent.

682

¶ 8. Stillman searched the vehicle and found a baggie of marijuana underneath the driver's seat. Stillman informed Johnson that he was under arrest, and conducted a search of Johnson's person incident to arrest. Johnson put his hand in his left pant pocket during the search and would not remove it on Stillman's request. Stillman conducted a "focus strike"—a hit to a specific area intended to stun or stop a certain movement—to Johnson's left arm to get him to remove his hand from his pocket. The strike was successful, and Stillman recovered a baggie from Johnson's pocket that contained several grams of crack cocaine.

¶ 9. Johnson was charged with possession of cocaine with intent to deliver more than five grams but not more than 15 grams, contrary to Wis. Stat. § 961.41(1m)(cm)2., and possession of tetrahydrocannabinols (THC), commonly known as marijuana, contrary to Wis. Stat. § 961.41(3g)(e). Johnson moved to suppress evidence obtained during the search of his person and vehicle on grounds that they were the product of an illegal stop and arrest.

¶ 10. The Racine County Circuit Court, the Honorable Allan B. Torhorst, denied Johnson's motion following a suppression hearing, holding that information about a possible emissions violation and Dummer's observation that the car failed to signal for a turn gave officers reasonable suspicion to stop Johnson's car. The court did not address whether the officers were justified in conducting a protective search of Johnson's car and person, stating that Stillman had "obtained Johnson's consent to search the vehicle."

¶ 11. Johnson eventually accepted a plea agreement in which he pled no contest to a reduced charge of cocaine possession with intent to deliver more than one gram but not more than five grams, contrary to Wis.

Stat. § 961.41(1m)(cm)1r.[3] Johnson was convicted on the reduced charge and was sentenced to a three-year term of imprisonment, consisting of one-and-one-half years' initial confinement and one-and-one-half years' extended supervision. Johnson appealed his conviction.

¶ 12. The court of appeals reversed Johnson's conviction. *State v. Johnson,* 2006 WI App 15, 288 Wis. 2d 718, 709 N.W.2d 491. On appeal, the State conceded that Johnson did not consent to the protective search of his vehicle. *Id.,* ¶ 9. The court of appeals focused its inquiry on whether Stillman had reasonable suspicion to justify the search of Johnson's vehicle. *Id.* The court held that " 'furtive' or suspicious movements do not automatically give rise to an objectively reasonable suspicion that the occupant of the vehicle is armed and dangerous." *Id.,* ¶ 17, (citing *State v. Kyles,* 2004 WI 15, ¶¶ 48–50, 269 Wis. 2d 1, 675 N.W.2d 449). The court concluded that Johnson's furtive movement in the car and his falling down during the pat down, when considered under the totality of the circumstances, did not give rise to an objectively reasonable suspicion that Johnson was armed and presented a threat to the safety of the officers. *Id.,* ¶ 18. Consequently, the court of appeals reversed the judgment of conviction. The State appeals the court of appeals' reversal of Johnson's conviction. We accepted review.

II

¶ 13. "Whether evidence should be suppressed is a question of constitutional fact." *State v. Knapp,* 2005 WI

---

[3] The possession of marijuana (THC) charge was dismissed as part of the plea bargain, but read in for purposes of sentencing on the conviction for possession with intent to deliver cocaine.

127, ¶ 19, 285 Wis. 2d 86, 700 N.W.2d 899 (quotation and citation omitted). A finding of constitutional fact consists of the circuit court's findings of historical fact, and its application of these historical facts to constitutional principles. *State v. Turner,* 136 Wis. 2d 333, 343–44, 401 N.W.2d 827 (1987). We review the former under the clearly erroneous standard, and the latter independently. *Id.*

## III

■

¶ 14. As a preliminary matter, we begin with the circuit court's determination that Stillman received Johnson's consent to search the car. The State concedes before this court, as it did in the court of appeals, that Johnson did not freely consent to the search of his vehicle.[4] We have reviewed the record and agree with

---

[4] The dissent faults the State for making this concession. Dissent, ¶ 60 n.2. It also takes Johnson to task for not raising the issue of whether his consent was voluntarily given. *Id.* It asserts that, due to the State's concession, this court "must raise and decide the issue of consent to search Johnson's vehicle with no assistance to this court from either party." *Id.*

We note, however, that an attorney has an ethical obligation not to make arguments before the tribunal that the attorney believes to be frivolous. *Compare* SCR 20:3.1(a) with Wis. Stat. § (Rule) 802.05. *Cf. State v. Parent,* 2006 WI 132, ¶ 19, 298 Wis. 2d 63, 725 N.W.2d 915. Thus, even when a concession of law is not accepted by a court, a prosecutor should be commended, not condemned, for exercising careful judgment and attempting to conform to our rules. Of course, a concession of law does not bind the court. The court determines the law, not the parties. *Bergmann v. McCaughtry,* 211 Wis. 2d 1, 7, 564 N.W.2d 712 (1997). We further note that the dissent is incorrect in suggesting that Johnson failed to raise the issue that his

the State that the circuit court's finding that Stillman obtained Johnson's consent to conduct a search of the car was clearly erroneous.

■

¶ 15. Whether a suspect freely consented to an otherwise unlawful search is a question of constitutional fact, which presents a mixed question of fact and law. *Turner,* 136 Wis. 2d at 343–44. As we indicated earlier, constitutional facts consist of a circuit court's findings of historical fact, which we review under the clearly erroneous standard, and its application of these historical facts to constitutional principles, which we review de novo. *Id.*[5]

---

consent was not voluntarily given. This was the principal issue raised by Johnson in his brief to the court of appeals. This was the issue that was addressed and conceded by the State in the court of appeals and in this court. The dissent simply disagrees with the conclusion reached by both parties and by this court.

[5] Here, the circuit court's five-page decision contains no discussion whatsoever of the testimony that is relevant to the question of whether Johnson freely consented to the search, and, notwithstanding the dissent's assertion to the contrary (dissent, ¶ 64), makes no findings of historical fact that are relevant to the question of consent. The circuit court points out, while discussing the parties' positions: "As a result of Johnson's situation Stillman abandoned his pat-down and obtained Johnson's consent to search the vehicle." The only findings of historical fact made by the circuit court, however, are as follows:

> First, the Johnson vehicle was the subject of an emissions suspension in August.

> Second, the vehicle successfully passed an emissions test in October.

> Third, the Motor Vehicle Department's records did not reflect the emissions suspension satisfied until November 7, after Johnson's arrest on 5 November.

¶ 16. When the purported legality of a warrantless search is based on the consent of the defendant, that consent must be freely and voluntarily given. *State v. Phillips*, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998) (citations omitted). "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "Acquiescence to an unlawful assertion of police authority is not equivalent to consent." *State v. Wilson*, 229 Wis. 2d 256, 269, 600 N.W.2d 14 (Ct. App. 1999) (citing *Bumper*, 391 U.S. at 548–49). This includes when the police incorrectly assert that they have a right to conduct a warrantless search, or indicate that they are going to search absent legal authority to do so, as opposed to asking for permission to search.[6]

---

The evidence also fairly establishes that Stillman did not independently nor subsequently after his arrest of Hicks check on the suspension of the Johnson vehicle's registration and prior to the Johnson arrest. A DOT check would have resulted in Stillman confirming the registration was still suspended on November 5th.

[6] *See Johnson v. United States*, 333 U.S. 10, 12–13 (1948) (officer did not gain defendant's consent to enter defendant's home when the officer knocked on the door, asserted that he wanted to talk to the defendant, the defendant stepped back from the door and the officer walked in, as entry was granted in submission to authority as opposed to an understanding and intentional waiver of a constitutional right); *See also United States v. Morales*, 171 F.3d 978, 982–83 (5th Cir. 1999)(suspects' opening door upon an order of officers did not constitute consent to search premises); *United States v. Pena-Saiz*, 161 F.3d 1175, 1177 (8th Cir. 1998) (where suspect believed that she was under arrest, her submission to a request to conduct a pat-down search was not consent); *United States v. Baro*, 15

¶ 17. The testimony of Officers Dummer and Still-man shows that Johnson merely acquiesced to the search. Johnson did not freely and voluntarily give his consent. Stillman testified during direct examination that he "sat [Johnson] down, asked him if there was anything illegal in the car. He said there wasn't. Went ahead and looked under the seat for the furtive movement that I saw . . . ." During cross-examination, Stillman testified that because of the "strong furtive movements" he observed in the car, he intended to conduct the search with or without Johnson's consent. Stillman's police report of the incident did not indicate that Stillman obtained Johnson's consent to search the vehicle. Stillman testified: "I don't remember asking [Johnson for his consent] and I don't see in the report if I asked him for consent." Stillman acknowledged that if he had obtained Johnson's consent he probably would have noted this fact in his report.

¶ 18. Dummer testified that Johnson went along with the search after "Stillman advised Mr. Johnson due to his movements that we were going to search the vehicle. Mr. Johnson didn't have a problem with that,

F.3d 563, 566–67 (6th Cir. 1994); (suspect did not consent to seizure of his person and of suspected drug money when officer, who lacked probable cause to execute a seizure, informed suspect that he was being taken to a DEA office and suspect acquiesced to the seizure); *State v. Wuest,* 190 Wis. 251, 255, 208 N.W. 899 (1926) (an otherwise illegal search of a suspect was not authorized when suspect failed to object to an officer's assertion of authority); *State v. Johnson,* 177 Wis. 2d 224, 228, 234, 501 N.W.2d 876 (Ct. App. 1993) (defendant's failure to object to officer's entry into home did not constitute consent to search, noting that "consent cannot be found by a showing of mere acquiescence") (citation omitted); 4 Wayne R. LaFave, *Search and Seizure* § 8.2(a), at 58–59 (4th ed. 2004).

gave consent." On cross-examination, however, Dummer clarified:

Q: And it's your testimony here that Officer Stillman was the officer that asked Mr. Johnson for consent to search his car; is that correct?

A: Correct. Well, actually, Officer Stillman advised Mr. Johnson due to his movements that we were going to search the vehicle.

Q: Okay.

A: At that time Mr. Johnson said: I don't have a problem with that.

Q: Okay. So your testimony is that Officer Stillman said: Because of your movements we're going to search your car?

A: As—that is our procedure, correct.

Q: Okay. And so really, if Mr. Johnson had indicated he didn't want you to, you still would have gone ahead with that search; is that correct?

A: That's correct.

Q: And basically Mr. Johnson indicated that he wasn't going to do anything to stop you; is that correct?

A: That's correct.

¶ 19. As the record indicates, neither Stillman nor Dummer asked for Johnson's permission to search the car. Stillman did not recall asking for consent, but indicated he would have noted that fact in his report if he had. Dummer clarified that Stillman advised Johnson that "we were going to search the vehicle." Johnson's response to that command must conse-

689

quently be construed as acquiescence. On the basis of the undisputed testimony of Stillman and Dummer, we therefore conclude that the circuit court's statement that Stillman obtained Johnson's consent to search the vehicle was against the great weight and clear preponderance of the evidence, and was, therefore, clearly erroneous. *See Richards v. First Union Securities, Inc.,* 2006 WI 55, ¶ 12 n. 5, 290 Wis. 2d 620, 714 N.W.2d 913 (noting that the former "great weight and clear preponderance" standard for reviewing a circuit court's findings of fact is essentially the same as the current "clearly erroneous" standard of review). As a matter of constitutional fact, we independently conclude that Johnson did not freely and voluntarily give his consent to search his vehicle.

## IV

¶ 20. The Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Wisconsin Constitution protect persons from unreasonable governmental searches and seizures. In general, our cases have ordinarily construed the search and seizure protections of the state and federal constitutions coextensively.[7] *See, e.g. State v. Williams,* 2001 WI 21, ¶ 18 n.6, 241 Wis. 2d 631, 623 N.W.2d 106 (citation omitted); *but see State v. Eason,* 2001 WI 98, ¶ 63, 245

---

[7] However, we have consistently recognized that Article 1, Section 11 of the state constitution is not the poor stepchild of its federal counterpart. As Justice Bablitch explained in *State v. Ward,* 2000 WI 3, ¶ 59, 231 Wis. 2d 723, 604 N.W.2d 517:

[I]t would be a sad irony for this court to exhort magistrates to act as something more than "rubber stamps" when issuing warrants, and to then act as mere rubber stamps ourselves when interpreting our Wisconsin Constitution. It is our responsibility to examine the State Constitution independently. This duty exists even

Wis. 2d 206, 629 N.W.2d 625 (holding that with respect to the good faith exception to the exclusionary rule, Article 1, Section 11 of the Wisconsin Constitution affords additional protection than that which is afforded by the Fourth Amendment).

■

¶ 21. During an investigative stop, an officer is authorized to conduct a search of the outer clothing of a person to determine whether the person is armed if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21 (1968). The test is an objective one: "[W]hether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger" because the person may be armed with a weapon and dangerous. *Id.* at 27. "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he [or she] is entitled to draw from the facts in light of his [or her] experience." *Id.* at 27.

■

¶ 22. Circuit courts must "decide on a case-by-case basis, evaluating the totality of the circumstances, whether an officer had reasonable suspicion to effectuate a protective search for weapons in a particular case." *State v. Kyles,* 2004 WI 15, ¶ 49, 269 Wis. 2d 1, 675

though our conclusions in a given case may not differ from those reached by the Supreme Court when it interprets the Fourth Amendment.

N.W.2d 449.[8] The requirement that an officer conducting a protective search have a reasonable suspicion to believe that the person is dangerous and may have immediate access to a weapon strikes a proper balance between two important interests: the safety of law enforcement officers and the right of persons to be free from unreasonable government intrusions. *See Terry,* 392 U.S. at 21–27.

¶ 23. In *Pennsylvania v. Mimms,* 434 U.S. 106 (1977), and *Michigan v. Long,* 463 U.S. 1032 (1983), the United States Supreme Court applied the principles of *Terry* to the validity of protective searches executed during a roadside stop. In *Mimms,* 434 U.S. at 111, the Court established a per se rule that an officer may order a person out of his or her vehicle incident to an otherwise valid stop for a traffic violation. However, to conduct a protective search of that person, the *Mimms* Court concluded an officer must be able to point to specific, articulable facts supporting a reasonable sus-

---

[8] The Wisconsin Legislature codified the standard of *Terry v. Ohio,* 392 U.S. 1 (1968), for protective searches in Wis. Stat. § 968.25, which provides, in relevant part:

> When a law enforcement officer has stopped a person for temporary questioning pursuant to s. 968.24 and reasonably suspects that he or she or another is in danger of physical injury, the law enforcement officer may search such person for weapons or any instrument or article or substance readily capable of causing physical injury and of a sort not ordinarily carried in public places by law abiding persons.

When construing § 968.25, we apply not only *Terry,* but also the cases following it. *See State v. Williamson,* 113 Wis. 2d 389, 399–400, 335 N.W.2d 814 (1983). Thus, we have held that § 968.25 incorporates *Michigan v. Long,* 463 U.S. 1032 (1983), *see infra* ¶¶ 23–26, thereby authorizing protective searches of vehicles, despite the fact that the text of the section refers only to protective searches of a suspect's person. *State v. Moretto,* 144 Wis. 2d 171, 177–78, 423 N.W.2d 841 (1988).

picion that the person is dangerous and may have immediate access to a weapon. *Id.* at 111–12.

¶ 24. Similarly, in *Long,* the Supreme Court held that officers may under the proper circumstances conduct a protective search of the passenger compartment of a vehicle during a traffic stop. Citing *Terry, Long* concluded that such a search is justified when an officer reasonably suspects that the person "is dangerous and . . . may gain immediate control of weapons" placed or hidden in the passenger compartment. *Long,* 463 U.S. at 1049.

¶ 25. This court is sensitive to the serious risks law enforcement officers must undertake whenever they initiate contact with a suspect who is seated in a vehicle. "Investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Long,* 463 U.S. at 1047. In *State v. Moretto,* 144 Wis. 2d 171, 179, 423 N.W.2d 841 (1988), we noted that the

> central policy of [Wis. Stat. § 968.25] is to "provide for the safety of the officer by permitting a search for weapons." Comments to chapter 255, laws of 1969. This policy is advanced by permitting vehicle searches where the officer has reasonable grounds to believe that the individual is dangerous and may be harboring a weapon in his or her vehicle. The Supreme Court in *Long* noted that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect who is stopped for questioning by police.

Moreover, this court has recognized that since *Terry,* the number of assaults on officers by armed suspects has increased, making "[t]he need for officers to frisk for weapons . . . even more compelling." *State v. McGill,* 2000 WI 38, ¶ 20, 234 Wis. 2d 560, 609 N.W.2d 795.

¶ 26. The Supreme Court in *Long* "stress[ed]" that its decision "d[id] not mean that the police may conduct automobile searches *whenever* they conduct an investigative stop." *Id.* at 1049 n.14 (emphasis in original). The sole justification for the search is the protection of the police officers and others nearby. *Id.* The Court noted that "[a] *Terry* search . . . is not justified by any need to prevent the disappearance or destruction of evidence of crime." *Id.*

¶ 27. Our prior decisions in this area, while based upon the unique circumstances of each case, provide guidance. In *Williams,* 241 Wis. 2d 631, ¶¶ 48–55, this court considered whether officers had reasonable suspicion to frisk a person whom officers suspected of drug trafficking based upon the tip of an anonymous informant. The informant called 911 and told the dispatcher that persons were selling drugs out of a blue and burgundy-colored van in a back alley-like driveway behind her home. *Id.,* ¶ 4. Officers were dispatched to investigate the tip and, shortly thereafter, arrived at the tipster's home. The officers pulled their squad car into the driveway and drove it up to the front of the van, where they observed a man later identified as Williams sitting in the front seat with his arm hidden behind the back of the passenger's seat. *Id.,* ¶¶ 7–8. Officers verified several details described by the informant. *Id.,* ¶ 6. Additionally, they noted that the van had no license plates. *Id.,* ¶ 7.

¶ 28. A majority of the *Williams* court concluded that the officers' protective search was supported by articulable facts justifying a reasonable suspicion that Williams may have been armed and dangerous.[9] The

---

[9] This court issued *State v. Williams,* 2001 WI 21, 241 Wis. 2d 631, 623 N.W.2d 106, after the U.S. Supreme Court

lead opinion's analysis of the reasonableness of the protective search focused on three conditions that were particularly relevant to the overall circumstances facing the officers.

¶ 29. First, officers in *Williams* were responding to a complaint involving suspected drug activity, a crime known by law enforcement to be associated with weapons possession. *Id.*, ¶ 51 ("[A]s [an officer involved in the stop and search of Williams] testified, 'drug dealers

---

vacated this court's decision in *State v. Williams*, 225 Wis. 2d 159, 591 N.W.2d 823 (1999), and remanded the case for further consideration in light of *Florida v. J.L.*, 529 U.S. 266 (2000), a case involving a stop and frisk based on an anonymous tip about an individual carrying a concealed weapon. The *J.L.* Court concluded the officers lacked reasonable suspicion to conduct the stop and frisk because the tip lacked sufficient indicia of reliability to justify the officer's action where the police knew nothing of the informant or how he knew about the gun, and had no other reason to believe that the informant had some inside information about J.L. *Id.* at 271–72.

On remand, a three-member plurality of this Court distinguished *J.L.* on grounds that the tip in *Williams* contained sufficient indicia of reliability for the officers to consider the information contained in the tip when determining the reasonableness of the stop and frisk. The plurality noted that the tipster in *Williams:* (1) was an eyewitness to the criminal activity and described what she saw as it was happening to the operator; (2) described her location to the operator; (3) risked that her identity would be discovered by providing self-identifying information to the operator; and (4) was recorded, permitting some review of her veracity based on her tone and delivery. *Williams*, 241 Wis. 2d 631, ¶¶ 33–37. Justice Prosser concurred in the judgment, but concluded that he would not have analyzed *Williams* as an anonymous informant case because officers knew or could have easily discovered the caller's identity because the county's 911 system was equipped with caller identification. *Id.*, ¶¶ 58, 64 (Prosser, J. concurring).

have been known to carry guns.' "). Other cases of this court have noted the link between dangerous weapons and the drug trade.[10] *See also State v. Guy,* 172 Wis. 2d 86, 96–97, 492 N.W.2d 311 (1992); *State v. Williams,* 168 Wis. 2d 970, 984, 485 N.W.2d 42 (1992); *State v. Richardson,* 156 Wis. 2d 128, 144, 456 N.W.2d 830 (1990). Second, officers observed Williams make a reaching movement behind the passenger seat when they pulled the squad car up to the van. *Williams,* 241 Wis. 2d 631, ¶ 53. Finally, the officers found themselves in a particularly vulnerable position vis-à-vis the suspects in *Williams;* their squad car was parked in an alley-like driveway facing the suspect's van, requiring that they back their vehicle out to exit.[11] *Id.,* ¶ 52. Based on these factors, this court concluded that officers had reasonable suspicion under the totality of the circumstances to justify the investigatory stop and their protective search of Williams' person and vehicle.

¶ 30. Likewise, in *McGill,* 234 Wis. 2d 560, this court concluded that several conditions incident to a traffic stop justified a protective search. There, the officer on squad patrol at 10:10 p.m. turned on his

---

[10] However, as this court observed in *Williams,* the scope of a *Terry* search must be " 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Williams,* 241 Wis. 2d 631, ¶ 53 (quoting *Terry v. Ohio,* 392 U.S. at 19)(citation omitted). For this reason, the *Williams'* court rejected adoption of a per se rule that suspicion of drug dealing of itself would constitute circumstances justifying a protective search. We reaffirm today our rejection of such a per se rule.

[11] Additionally, officers observed that Williams' van had no license plates. This court considered this circumstance in its analysis of whether the investigative stop was justified, but did not factor it into the discussion of the reasonableness of the protective search. *See Williams,* 241 Wis. 2d 631, ¶¶ 45, 48–55.

emergency lights to pull over a vehicle after it drove onto a barricaded street that was posted "road closed." *Id.,* ¶¶ 2–3. The vehicle did not stop and pull over, and drove several more blocks. *Id.,* ¶ 4. When the vehicle eventually stopped in a private driveway, McGill exited the car and began to walk away "as if he were 'trying to avoid being with that vehicle or being stopped by the police.' " *Id.,* ¶ 5. The officer ordered McGill to stop and return to his vehicle, and McGill complied. *Id.,* ¶ 6. The officer observed that McGill appeared more nervous than other individuals he had routinely stopped while on patrol, that his hands were twitching, and that he had the odor of intoxicants and the slight odor of marijuana on his person. *Id.,* ¶ 7.

¶ 31. On these facts—McGill's erratic behavior (failing to pull over in a timely manner, exiting the vehicle immediately after the stop and walking away, unusual nervousness), the fact that he smelled of both drugs and alcohol, and the poorly-lit conditions in the private driveway—this court concluded that the protective frisk was justified because, under the totality of the circumstances, the officer had reasonable suspicion to believe that McGill may have been dangerous and had access to a weapon. *Id.,* ¶¶ 8, 24, 27–33.

¶ 32. However, in *Kyles,* 269 Wis. 2d 1, this court reached a different conclusion. There, Kyles was questioned outside of a vehicle he was a passenger in that was pulled over at 8:45 p.m. in a "high-crime" neighborhood for operating without headlights after dark. *Id.,* ¶ 11. No one in the vehicle was suspected of a crime. *Id.* During a consensual search of the vehicle, Kyles appeared nervous and twice stuffed his hands in the pockets of his oversized, fluffy coat after the officer asked him to remove his hands from his pockets. *Id.,* ¶¶ 13–14. Kyles did not try to flee. *Id.,* ¶ 13. The

officer testified that he "didn't feel any particular threat before searching" Kyles.[12] *Id.,* ¶ 17. Nevertheless, Kyles was frisked approximately four to eight seconds after he exited the vehicle. *Id.,* ¶ 15.

¶ 33. Taken together, this court concluded that without more, Kyles' putting his hands in his pockets, his nervousness, the size and bulkiness of his coat, the time (8:45 p.m.) and place ("high-crime" area) of the stop, as well as the officer's belief that he was not in danger, provided the officer with no more than "an inchoate and unparticularized suspicion or 'hunch'," instead of a reasonable suspicion that the defendant was armed and dangerous to the officer or others. *Id.,* ¶¶ 69–72.

V

¶ 34. Turning to the present case, the State contends that Johnson's movement in the interior of the car was a sufficiently compelling factor to justify Stillman's protective search of Johnson's car. The State asserts that the court of appeals improperly concluded this single factor, by itself, was not enough to establish reasonable suspicion.

---

[12] Although the test of reasonableness is generally an objective one, we held in *Kyles* that "a court may . . . consider a police officer's fear or belief that his or her safety or that of others [is] in danger as part of the totality of the circumstances" when determining the reasonableness of a frisk. *State v. Kyles,* 2004 WI 15, ¶ 34, 269 Wis. 2d 1, 675 N.W.2d 449. We emphasized in *Kyles* that the officer's subjective belief "is but one factor in the totality of the circumstances that a court may consider," *id.,* ¶ 39, that "may be of some assistance to a court in weighing the totality of the factors" in determining the reasonableness of a protective search. *Id.,* ¶ 37.

698

¶ 35. We agree with the State that the presence of a single factor, if sufficiently compelling, may give rise to reasonable suspicion justifying a protective search. The cumulative effect of several factors in one case may not add up to reasonable suspicion while a single, highly persuasive factor in another may provide a sufficient basis for a search. *See State v. Sutherland,* 637 N.E.2d 366, (Ohio Ct. App. 1994) (search of vehicle incident to routine traffic stop justified by "furtive" movements of the driver and passenger); *see also United States v. Beatty,* 170 F.3d 811 (8th Cir. 1999) (search of vehicle justified where officer saw leather strap from a gun holster protruding from a briefcase in vehicle). "There is no set standard for what constitutes a reasonable police reaction in all situations. Rather, the reasonableness of the reaction depends upon the circumstances facing the officer." *State v. Mohr,* 2000 WI App 111, ¶ 13, 235 Wis. 2d 220, 613 N.W.2d 186. "The essential question is whether the action of the law enforcement officer was reasonable under all the facts and circumstances present." *State v. Richardson,* 156 Wis. 2d 128, 139–40, 456 N.W.2d 830 (1990) (quoting *State v. Jackson,* 147 Wis. 2d 824, 831, 434 N.W.2d 386 (1989)).

¶ 36. Under the totality of the circumstances present in this case, we conclude that Johnson's "head and shoulders" movement did not give Stillman reasonable suspicion to conduct a search of Johnson's person and car.

¶ 37. Stillman and Dummer testified that, in light of their experience, they believed that Johnson's movement was consistent with an attempt to conceal contra-

band or weapons.[13] Depending upon the totality of the circumstances in a given case, a surreptitious movement by a suspect in a vehicle immediately after a traffic stop could be a substantial factor in establishing that officers had reason to believe that the suspect was dangerous and had access to weapons.

¶ 38. Such was the case in *Williams*. There, however, additional circumstances were critical to this court's conclusion that officers possessed specific, articulable facts justifying a protective search. *Williams,* 241 Wis. 2d 631, ¶¶ 51–55. Williams, unlike Johnson, was suspected of selling drugs, *id.,* ¶ 51, a crime officers have known to be associated with the possession of deadly weapons. *See, e.g. Harmelin v. Michigan,* 501 U.S. 957, 1002–03 (1991) (citing Goldstein, *Drugs and Violent Crime,* in *Pathways to Criminal Violence* 16, 24–36 (N. Weiner & M. Wolfgang eds. 1989)) (plurality opinion) (Kennedy, J., joined by O'Connor and Souter, JJ.). Moreover, the position of the officer's squad car in *Williams*—nose-to-nose with the suspect's van in a narrow, alley-like driveway—left officers in a more vulnerable position than the officers here.

¶ 39. Similarly, *McGill,* 234 Wis. 2d 560, is readily distinguishable. McGill, unlike Johnson, smelled of both drugs and alcohol when stopped. *Id.,* ¶ 7. Once again, the police officers already had a basis for believing that ongoing criminal activity may have been afoot.[14] Moreover, McGill's odd behavior, including con-

---

[13] As we noted earlier, the sole justification of a protective search under *Terry* is the protection of the police officers and others nearby. A protective search is not justified by any need to preserve or discover evidence. *See supra,* ¶ 26.

[14] We do not mean to suggest that officers must always have evidence that the subject of the investigative stop is engaged in criminal activity to be authorized to conduct a protective search

tinuing to drive for several blocks when signaled by officers to pull over, exiting his car and walking away after the stop and extreme nervousness, *id.*, ¶¶ 4–7, provided a compelling basis to justify the officers' frisk. Such compelling circumstances were not present here.

¶ 40. In this case, Johnson was only suspected of driving a vehicle with a suspended registration for an emissions violation and failing to signal for a turn, violations in no way linked to criminal activity or weapons possession. Johnson was further able to satisfy the officer that the suspended registration had been taken care of. What was left was a traffic violation for failure to signal a turn, and the head and shoulders movement.[15]

¶ 41. As in *Kyles,* where we concluded officers lacked reasonable suspicion to conduct a protective search, Johnson was not suspected of a crime associated with weapons possession, and officers had had no prior

incident to a traffic stop. *See, e.g. United States v. Arnold,* 388 F.3d 237, 238 (7th Cir. 2004) (defendant stopped for burned-out headlight; protective search of the vehicle upheld where the defendant turned around to look at the officer in the squad car then "wormed his way between the passenger and the driver's seats into the back seat"); *United States v. Fryer,* 974 F.2d 813, 819 (7th Cir. 1992) (defendant stopped for failure to come to a complete stop before making right turn on red light; protective search of the vehicle upheld when officer "observed furtive movements between the driver and the passenger, as if they were passing something between them," driver did not stop immediately when signaled to pull over, and stop occurred in "a marginally safe neighborhood, in the wee hours of the morning").

[15] Moreover, we note that Officer Stillman did not ask Johnson to explain the surreptitious movement that he had observed before conducting the protective search of the vehicle. A suspect's answer to such a question and demeanor while answering could provide information that is relevant to whether a protective search is reasonable.

contact with Johnson suggesting that he was a dangerous individual. The stop occurred in early evening in an area that was well lit. Johnson cooperated with officers, producing documentation showing that his vehicle had recently passed an emissions test. Despite complaining of a bad leg, Johnson complied with Stillman's lawful request for him to exit the vehicle.

¶ 42. Moreover, in *Kyles,* the circumstances facing officers were arguably more dangerous (and thus a search more justifiable) than those of the present case. There, officers were engaged in a face-to-face confrontation with an unusually nervous suspect who refused to remove his hands from his pockets. *Kyles,* 269 Wis. 2d 1, ¶¶ 12–14. In addition, the stop occurred at 8:45 p.m. in a "high-crime" area. *Id.,* ¶¶ 11, 17. In contrast, the only purported basis for the protective search in this case was a single, partially obscured movement the officers observed from their squad car.

¶ 43. Were we to conclude that the behavior observed by the officers here was sufficient to justify a protective search of Johnson's person and his car, law enforcement would be authorized to frisk any driver and search his or her car upon a valid traffic stop whenever the driver reaches to get his or her registration out of the glove compartment; leans over to get his wallet out of his back pocket to retrieve his driver's license; reaches for her purse to find her driver's license; picks up a fast food wrapper from the floor; puts down a soda; turns off the radio; or makes any of a number of other innocuous movements persons make in their vehicles every day. In each of these examples, the officer positioned behind the vehicle might see the driver's head and shoulders move, or even momentarily disappear from view. Without more to demonstrate that, under the totality of circumstances, an officer

possesses specific, articulable facts supporting a reasonable suspicion that a person is dangerous and may have immediate access to a weapon, such an observation does not justify a significant intrusion upon a person's liberty.

¶ 44. The test of reasonableness is an objective one: " 'In determining whether the officer acted reasonably . . . due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.' " *Bies v. State,* 76 Wis. 2d 457, 466, 251 N.W.2d 461 (1977) (*quoting Terry,* 392 U.S. at 27). The dissent ignores this well-established principle and relies on the officers' subjective experience, stating that their training and experience as law enforcement officers justified their perceptions. Dissent, ¶¶ 82–84. For example, the dissent argues that the officers were faced with "two choices. They could ignore what they believed to be Johnson's reaching under the front seat and also ignore their experiences as law enforcement officers as to what such a reaching could mean" or they could conduct a protective search of the vehicle. Dissent, ¶ 84. We note, however, that the officer's subjective experience is not the proper focus of the analysis; the relevant inquiry is whether the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21. This is a question of law, subject to our independent review.[16] *State v. Matejka,* 2001 WI 5, ¶ 16, 241 Wis. 2d 52, 621 N.W.2d 891.

---

[16] The dissent repeatedly questions this court's competence to decide the legal question presented in this case. *See* dissent, ¶¶ 85, 88. For example, the dissent states: "[T]he majority of this court, none of whom have any experience conducting traffic

¶ 45. Another factor weighs strongly against the reasonableness of the protective search in this case. Before Johnson was asked to exit the vehicle and submit to a pat down, he gave Stillman paperwork showing that his vehicle had passed an emissions test recently, and that, as a result, the registration suspension had been lifted. Officers may detain a person on a stop for a routine traffic violation only for as long as necessary to complete the investigation of the violation. *See Knowles v. Iowa*, 525 U.S. 113, 117 (1998). The paperwork Johnson provided to Stillman established that Johnson's vehicle was no longer subject to an emissions suspension.[17]

---

stops, is merely substituting its judgment for that of two experienced officers." Dissent, ¶ 85. The dissent continues: "In addition, [the majority] errs when it substitutes its judgment for that of law enforcement about the reasonable import of Johnson's furtive movement as the officers approached his vehicle." Dissent, ¶ 88. This is just another way of saying that only law enforcement officers (or perhaps judges who happen to have been former law enforcement officers) are qualified to determine the reasonableness of a protective search. The dissent would apparently have this court abdicate its constitutional function of ascertaining whether specific and articulable facts which, taken along with rational inferences from those facts, meet the legal standard of reasonably warranting an intrusion by law enforcement officers. *See* dissent, ¶¶ 85, 88. *Compare State v. Matejka*, 2001 WI 5, ¶ 17, 241 Wis. 2d 52, 621 N.W.2d 891.

[17] We recognize that the officers noted that Johnson had failed to signal a turn prior to the stop. The record does not establish whether the officers had finished their investigation with respect to his failure to signal a turn. What is clear in light of *Knowles v. Iowa*, 525 U.S. 113 (1998), is that once an investigation for a minor traffic violation is completed, the officers' generalized concern for safety does not provide a basis for a full protective search.

¶ 46. Finally, the State contends that Johnson's falling down during the protective frisk of his person "sheds light" on the reasonableness of the search of the passenger's compartment of the vehicle. The State argues that Johnson's behavior during the pat down was part of the totality of the circumstances under which Johnson's furtive movement in the car should be assessed. However, in the same breath, the State concedes that "post-protective search occurrences cannot establish reasonable suspicion for a protective search."

¶ 47. We reject the State's assertion that Johnson's collapse to the ground during the frisk because of leg pain (whether feigned or actual) is in any way relevant to the reasonableness of the protective search. As we have explained, officers lacked reasonable suspicion to conduct the pat down of Johnson's person. Thus, any events resulting from that pat down may not be considered when calculating the reasonableness of the search of the vehicle.

VI

¶ 48. Because the protective search was not justified by specific, articulable facts supporting a reasonable suspicion that Johnson posed a threat to the officers' safety or that of others, we conclude the circuit court erred in denying Johnson's motion to suppress contraband obtained incident to the search of his car and his person. We therefore affirm the court of appeals' decision reversing the circuit court's judgment of conviction and remand for further proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 49. PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). Gary A. Johnson was convicted of possession

of cocaine with intent to deliver due to the discovery of 11 individually wrapped rocks of crack cocaine on his person. The majority affirms the court of appeals reversal of Johnson's conviction. It does so because it concludes that the search of Johnson's vehicle, which led to the search of his person, "was not justified by specific, articulable facts supporting a reasonable suspicion that Johnson posed a threat to the officers' safety or [to] that of others." Majority op., ¶ 1. The majority opinion makes two basic errors. First, it errs when it permits an assistant attorney general's "concession" that Johnson did not consent to the search of his vehicle to affect the court's obligation to fully analyze the totality of the circumstances that led to the vehicle's search. *Id.,* ¶ 14. Second, it errs when it substitutes its own view, for that of experienced police officers' contrary view, in regard to whether it was reasonable for the officers to believe that Johnson's appearing to reach under the front seat as the officers approached his vehicle could be due to his placing a weapon or contraband under the seat. *Id.,* ¶ 36.

¶ 50. Because the circuit court's finding of fact that Johnson's consent-in-fact to the search of his vehicle cannot be overturned, as it is not clearly erroneous, and because Johnson did not agree to the proposed search as a result of law enforcement's coercion, duress or misrepresentation, his consent was voluntarily given. In addition, it was reasonable for law enforcement to believe Johnson's furtive movement as the officers approached his vehicle could have been due to placing a weapon under the front seat. As I explain in detail below, rectifying either of these errors in the majority opinion will result in affirming Johnson's conviction. Accordingly, I respectfully dissent.

706

## I. BACKGROUND

¶ 51. Officers Dummer and Stillman, who where in a marked squad car with the emergency lights and siren activated, stopped Johnson's vehicle for a suspected registration violation and for failing to signal a turn. As the officers approached Johnson's vehicle, Johnson leaned forward so that most of his head and shoulders disappeared from view. Officer Dummer testified that Johnson appeared to be reaching under the front seat. He said that based on his law enforcement experience, a movement of that type can occur when an occupant of a vehicle is trying to conceal weapons or contraband under the seat before an officer reaches the vehicle. Officer Stillman confirmed the description of Johnson's movement as he and Dummer walked to Johnson's vehicle. He also interpreted this movement as Johnson's placing something under the front seat. At no time has Johnson or his counsel ever disputed the accuracy of the officers' description of his movement as they approached.

¶ 52. Dummer explained that when he and Stillman reached the vehicle, Stillman asked Johnson to step out, and Johnson did so. Stillman then tried to do a pat-down search for weapons, but he was unable to complete it because whenever he got to the pocket on the left leg of Johnson's pants, Johnson fell to the ground. Therefore, Stillman asked Johnson to sit on the curb, and Dummer stood right behind him, "always watching over him so that he didn't make any more movements." Stillman asked Johnson if there was anything illegal in the vehicle, and Johnson said there was not. Stillman then told Johnson that he was going to search the

vehicle. Dummer said that Johnson affirmatively replied to Stillman, "I don't have a problem with that."[1]

¶ 53. When Stillman searched the vehicle, he recovered a bag of marijuana from under the driver's seat. Dummer confirmed that the bag of marijuana was found where he had seen Johnson reaching. Johnson denied that the marijuana was his, but Stillman placed Johnson under arrest for its possession. He then searched Johnson incident to that arrest. When he did so, he discovered 11 individually wrapped rocks of crack cocaine in the pocket on the left leg of Johnson's pants—the same pocket on which the officer had been unable to do a pat-down because Johnson had repeatedly fallen to the ground. After the cocaine was recovered, Dummer testified that Johnson said that he had begun selling crack cocaine only recently.

¶ 54. Johnson moved to suppress the drugs found in the car and on him, as well as his statement that he was selling crack cocaine. After an evidentiary hearing, the circuit court found that Johnson consented to the search of his vehicle, and it denied the motion. As part of a plea agreement, Johnson pled guilty and was convicted of possession with intent to deliver a lesser amount of crack cocaine than had been found on his person.

¶ 55. Johnson appealed his conviction based on a claimed error of the circuit court in denying his motion to suppress the admission of the drugs found and his statement to the officers. On appeal, the State "conceded" that Johnson did not consent to the search of his vehicle. The court of appeals reversed the circuit court decision on suppression, based in part on the State's

---

[1] The majority opinion agrees that Johnson made this statement. Majority op., ¶ 18.

"concession," which the court of appeals accepted without discussion. We granted the State's petition for review.

## II. DISCUSSION

### A. Standard of Review

¶ 56. Whether a defendant has consented to a search is initially a question of historic fact. *State v. Garcia,* 195 Wis. 2d 68, 75, 535 N.W.2d 124 (Ct. App. 1995). We will uphold a circuit court's finding of historic fact unless it is clearly erroneous. *State v. Sykes,* 2005 WI 48, ¶ 12, 279 Wis. 2d 742, 695 N.W.2d 277 (citing *State v. Vorburger,* 2002 WI 105, ¶ 32, 255 Wis. 2d 537, 648 N.W.2d 829). Whether the consent-in-fact was voluntarily given is a question of constitutional fact that we review independently. *State v. Phillips,* 218 Wis. 2d 180, 195, 577 N.W.2d 794 (1998).

¶ 57. Whether a law enforcement officer has articulated sufficient facts that, when taken together with the rational inferences from those facts, would cause a reasonable officer to believe that his safety or that of others was in danger, is a question of law for our independent review. *State v. Matejka,* 2001 WI 5, ¶ 16, 241 Wis. 2d 52, 621 N.W.2d 891.

### B. Constitutional Principles

¶ 58. The test for searches and seizures that are alleged to have violated the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution is one of reasonableness, because only unreasonable searches and seizures violate constitutional guaranties. *State v. Stout,* 2002 WI App 41, ¶ 10, 250 Wis. 2d 768, 641 N.W.2d 474 (citing

*Florida v. Jimeno,* 500 U.S. 248, 250 (1991)). Searches and seizures conducted without a warrant are unreasonable, subject to certain exceptions. *Id.* Consent to search is one such exception. *Phillips,* 218 Wis. 2d at 196. Another exception occurs when "a police officer observes behavior that he or she reasonably believes is suspicious," such that either the safety of the officer or the safety of others could be in jeopardy. *Stout,* 250 Wis. 2d 768, ¶ 10 (citing *Minnesota v. Dickerson,* 508 U.S. 366, 372–73 (1993)).

1. Johnson's consent

¶ 59. Whether an individual has given consent to search is, in the first instance, a question of fact. *Garcia,* 195 Wis. 2d at 75. In the first step of this analysis, we determine what the defendant said or did. *Id.* The validity of the consent given is not affected by whether an officer informs the person that he or she has the right to withhold consent. *Ohio v. Robinette,* 519 U.S. 33, 34 (1996); *Vorburger,* 255 Wis. 2d 537, ¶ 100; *Phillips,* 218 Wis. 2d at 203. Consent may be given verbally or it may be given in a non-verbal form, by gestures or actions. *State v. Tomlinson,* 2002 WI 91, ¶ 37, 254 Wis. 2d 502, 648 N.W.2d 367. If consent-in-fact is found, the second step is to determine whether the consent was constitutionally sufficient. *Phillips,* 218 Wis. 2d at 190–94.

¶ 60. Only voluntarily given consent will pass constitutional muster.[2] *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973); *Phillips,* 218 Wis. 2d at 194–95.

---

[2] Johnson does not assert to this court that his consent to search the vehicle was not voluntarily given. This may be due to the assistant attorney general's concession that Johnson did not consent to the search. Because of that concession, the court must raise and decide the issue of consent to search Johnson's

Consent that is the product of duress, coercion or misrepresentation by law enforcement is not voluntarily given consent. *Schneckloth,* 412 U.S. at 227; *Bumper v. North Carolina,* 391 U.S. 543, 548 (1968); *State v. Giebel,* 2006 WI App 239, ¶ 19, 297 Wis. 2d 446, 724 N.W.2d 402. There is no single fact, the absence or presence of which, determines whether consent was voluntarily given. *Schneckloth,* 412 U.S. at 226. "The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone." *Id.* at 229. Rather, in order to determine whether consent was voluntarily given, the totality of the circumstances of each individual case must be examined. *Id.* at 233. In examining the totality of the circumstances, we consider "both the circumstances surrounding the consent and the characteristics of the defendant." *Phillips,* 218 Wis. 2d at 198 (additional citations omitted). The State has the burden of proving that the consent was freely and voluntarily given. *Schneckloth,* 412 U.S. at 222 (further citations omitted).

¶ 61. In addressing the issue of consent, the majority conflates consent-in-fact with the voluntariness of the consent. Majority op., ¶¶ 16–19. When a verbal response is given, as occurred here, consent to search and the voluntariness of the consent are two separate issues, with different tests and different standards of review. *Phillips,* 218 Wis. 2d at 196–97.

---

vehicle with no assistance to this court from either party. This writer objects to the assistant attorney general's less than complete representation of all arguable issues. The issue of consent to search Johnson's vehicle is not frivolous, as the circuit court's finding, the majority opinion and the dissent show.

¶ 62. Because the circuit court found that Johnson consented to the search of his vehicle, I begin with a review of the circuit court record to determine whether a finding that Johnson's consent-in-fact is clearly erroneous. *State v. Kieffer,* 217 Wis. 2d 531, 541, 577 N.W.2d 352 (1998). The transcript of the hearing of Johnson's motion to suppress shows that Officer Dummer, one of the arresting officers, testified that Johnson's response to Officer Stillman's statement that he was going to search Johnson's vehicle was, "I don't have a problem with that." There is nothing equivocal about Johnson's statement. Johnson was present and represented by counsel at the suppression hearing. He heard Dummer's testimony. However, Johnson did not testify that Dummer's statement was incorrect.[3] He also has not argued that the officer reported his statement incorrectly.

¶ 63. The testimony of Dummer is sufficient to support the finding that Johnson consented, and even if more than one inference could have been drawn from the testimony at the suppression hearing, it is for the circuit court to decide which inference to choose. *State v. Friday,* 147 Wis. 2d 359, 370–71, 434 N.W.2d 85 (1989). "[T]he inferential finding of the suppression judge[] was not a legal determination to be addressed de novo by the court of appeals . . . ." *Id.* at 371. There is nothing in the record that would show that the circuit court's finding of historic consent-in-fact was clearly erroneous.

---

[3] I am fully aware that Johnson has no obligation to testify, and that it is the State's burden to prove that consent was given. *See State v. Stout,* 2002 WI App 41, ¶ 10, 250 Wis. 2d 768, 641 N.W.2d 474 (citing *United States v. Basinski,* 226 F.3d 829, 833 (7th Cir. 2000)).

¶ 64. However, instead of analyzing whether the circuit court's finding of historic fact, i.e., what did Johnson say, was clearly erroneous, the majority opinion focuses on the officer's statement that he would have searched the vehicle even if Johnson had said that he could not. Majority op., ¶ 18. However, the officer did not tell Johnson that he was going to search his vehicle even if Johnson said he could not. Furthermore, it has long been the law in Wisconsin, as we have recently explained, that we are "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *State v. Sykes,* 2005 WI 48, ¶ 29, 279 Wis. 2d 742, 695 N.W.2d 277 (quoting *Accord Arkansas v. Sullivan,* 532 U.S. 769, 771 (2001) (further citations omitted). The officers' subjective beliefs are not dispositive of any aspect of the Fourth Amendment questions presented here. Accordingly, because the circuit court's finding of historic fact was not clearly erroneous, I move to the second step of the consent analysis, whether Johnson's verbal response was consent voluntarily given.

¶ 65. The totality of the circumstances surrounding the consent show there was no coercion, duress or misrepresentation by law enforcement. When Johnson fell to the ground a second time as the officer attempted to pat-down the pocket in the left leg of his pants, the officers permitted him to sit on the curb. In so doing, they were solicitous of Johnson's claimed leg injury. They did not threaten him or misrepresent any fact to him. Johnson appeared to understand what the officers were saying, as he sat on the curb and waited while the officer searched his vehicle. His statement, "I don't have a problem with that" was a direct response to the officer's statement. Furthermore, Johnson has not claimed he was coerced, or that he was under duress

when he responded or that law enforcement misrepresented to him. Accordingly, I conclude that Johnson's consent to search his vehicle passes constitutional muster, as the totality of the circumstances show it was voluntarily given.

¶ 66. The majority opinion concludes that because the officer advised Johnson that he was going to search the vehicle, Johnson's response, "I don't have a problem with that" is insufficient to show consent and shows only "acquiescence." Majority op., ¶ 19. The majority then goes on to conclude that because there was "acquiescence," as the majority uses that term, the circuit court's finding that Johnson consented is clearly erroneous. *Id.*

¶ 67. However, the concept of acquiescence, *when there is a verbal response* to law enforcement in regard to a proposed search, is related to voluntariness, a question of constitutional fact. *State v. Wilson,* 229 Wis. 2d 256, 269, 600 N.W.2d 14 (Ct. App. 1999). Acquiescence is a term that has been used in a number of opinions. But contrary to the majority opinion's assertion, it is not the silver bullet to set aside voluntarily given consent.

¶ 68. For example, in *Schneckloth,* while relating the reasoning underlying *Davis v. United States,* 328 U.S. 582 (1946), the Supreme Court explained that even though there was an initial refusal, "that [] initial refusal to turn the coupons over was soon followed by acquiescence in the demand—these circumstances all support the conclusion of the District Court [that petitioner consented to the search]." *Schneckloth,* 412 U.S. at 233. Therefore, in *Schneckloth,* the Supreme Court's own use of the term, acquiescence, shows it is not fatal to a constitutionally sufficient consent.

714

¶ 69. However, acquiescence causes Fourth Amendment problems when the acquiescence is made to claimed lawful authority to search, when no such lawful authority exists. *Bumper,* 391 U.S. at 548–49. For example in *Bumper,* law enforcement personnel obtained permission of the homeowner to search by asserting that they had a warrant to search. *Id.* However, they had no warrant. *Id.* As the supreme court explained, the consent obtained subsequent to this misrepresentation was not a voluntary consent:

> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search.

*Id.* at 550.

¶ 70. The court of appeals applied a similar analysis in *Giebel,* where law enforcement showed Giebel part of a subpoena, implying it was for his computer. Giebel said that when the officer showed him part of the subpoena, he believed he had no choice to refuse to give consent. *Giebel,* 2006 WI App 239, ¶ 7, 297 Wis. 2d 446. The court of appeals considered the totality of the circumstances surrounding Giebel's consent and concluded that his consent was not voluntary. As the court explained, "we will not presume acquiescence in the loss of a fundamental right." *Id.,* ¶ 16 (citing *Ohio Bell Tel. Co. v. Pub. Util.'s Comm'n of Ohio,* 301 U.S. 292, 307 (1937).

¶ 71. The majority opinion uses acquiescence incorrectly because it does not acknowledge that when a person gives a verbal, but positive, response to a request to search or a statement that a search will be conducted, he is always "acquiescing" to law enforce-

ment.[4] However, such "acquiescence" is not the equivalent of an involuntary consent, and only that acquiescence that evidences involuntary consent violates constitutional guarantees. *See State v. Williamson,* 58 Wis. 2d 514, 521, 206 N.W.2d 613 (1973) (concluding that Williamson's response of "I don't care" to an officer's request to search his car did not even raise the issue of voluntariness of the consent to search).

¶ 72. Only verbal acquiescence that is evidence of a consent that is involuntarily given runs afoul of the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution. *See State v. Bermudez,* 221 Wis. 2d 338, 585 N.W.2d 628 (Ct. App. 1998) (explaining that when the totality of the circumstances shows that consent was obtained due to duress, coercion or misrepresentation by law enforcement, it is constitutionally insufficient because it was obtained by "acquiescence to an unlawful assertion of authority"). *Id.* at 348 (citing *Bumper,* 391 U.S. at 548–49).

¶ 73. The majority opinion also quotes a statement from *Wilson* that "Acquiescence to an unlawful assertion of police authority is not equivalent to consent," but its analysis slides over the requirement that the assertion of authority must be "unlawful." Majority op., ¶ 16. In *Wilson,* the court of appeals opinion relies on the unlawfulness of police action and the duress applied to Wilson to obtain consent to search. *Wilson,* 229 Wis. 2d at 269. *Wilson* relies on *Bumper* where law enforcement obtained consent by misrepresenting that they had a warrant to search. In *Wilson,* law enforce-

---

[4] Webster defines acquiesce as "to accept or comply tacitly or passively." *Webster's New Collegiate Dictionary* 11 (1977). An antonym for "to acquiesce" is "to object." *Id.*

716

ment unlawfully penetrated the curtilage of Wilson's home and applied duress by refusing to permit Wilson to use the bathroom until he was searched, such that the totality of the circumstances showed that the search was unlawful. *Id.*

¶ 74. However, there is nothing "unlawful" about an officer saying, "I am going to search the car," any more than there would have been in a question, "Can I search the car?" As *Bermudez,* and the cases on which it relies, explain, an "unlawful" assertion of authority arises when law enforcement is coercive, applies duress or misrepresents to the person whose property law enforcement seeks to search. *Bermudez,* 221 Wis. 2d at 348. There was nothing unlawful about the officer's statement to Johnson.

¶ 75. The record created in the circuit court shows that the State's concession that Johnson did not consent to the search of his vehicle should have been rejected by the majority of this court. As Professor Blinka relates, "A consent search is constitutionally reasonable to the extent that the search remains within the bounds of the actual consent given to the officers." 9 Christine M. Wiseman, Nicholas L. Chiarkas & Daniel D. Blinka, *Wis. Prac., Criminal Practice & Procedure* § 19.82 (2006) (citing *State v. Douglas,* 123 Wis. 2d 13, 22, 365 N.W.2d 580 (1985)). Here, there can be no question that Johnson's consent to search his vehicle was not exceeded. Marijuana was found under the front seat of Johnson's vehicle and Johnson consented to the scope of that search.

¶ 76. Johnson was arrested for possession of marijuana (tetrahydrocannabinols also referred to as THC), contrary to Wis. Stat. § 961.41(3g)(e); therefore, the subsequent search of his person, where the 11 rocks of crack cocaine were found, was incident to a lawful

717

arrest. There is no basis for suppressing the discovery of crack cocaine on Johnson's person, nor is there any basis to suppress his statement that he had just begun selling crack cocaine. The majority opinion errs in doing so.

## 2. Reasonable inference

¶ 77. Setting aside the issue of Johnson's consent to search his vehicle, the majority also errs when it concludes that Johnson's furtive movement as the officers approached his vehicle could not reasonably be interpreted by the officers as Johnson placing a weapon under the vehicle's front seat. *See* majority op., ¶¶ 29–30.

¶ 78. The United States Supreme Court has held that there is "no ready test for determining reasonableness [of a search] other than by balancing the need to search against the invasion which the search entails." *Terry v. Ohio,* 392 U.S. 1, 21 (1968) (quoting *Camara v. Municipal Court,* 387 U.S. 523, 536–37 (1967)). The need to search is affected by the location in which an officer encounters a suspect because that factor may affect officer safety. For example, "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Michigan v. Long,* 463 U.S. 1032, 1047 (1983).

¶ 79. One study showed that "approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile." *Id.* at 1048 n.13. As the Supreme Court has noted, "suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed." *Id.* at 1048. And finally, the passenger compartment of an automobile, to which a suspect who has been briefly detained may return, provides access to any

718

weapons that are inside that compartment. *Id.* at 1052. "If a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested." *Id.* at 1050.

¶ 80. When a suspect who has been detained but has not been arrested is about to return to his vehicle, an officer must make a "quick decision as to how to protect himself and others from possible danger." *Id.* at 1052 (quoting *Terry,* 392 U.S. at 28). In order to engage in a weapons search of the passenger compartment of an automobile subsequent to a traffic stop where the vehicle's occupant has not been arrested, an officer must have an "articulable suspicion" that re-entry of the vehicle by the suspect has the capacity to create a "potentially dangerous" situation for the officer or others. *Id.* at 1052 n.16.

¶ 81. The search of the passenger compartment of a vehicle is not so intrusive as the search of one's person. *See Matejka,* 241 Wis. 2d 52, ¶ 28. Therefore, when the need for a search is balanced with the intrusiveness of a search, need for officer safety may weigh more heavily in the balance if a passenger compartment were being searched than it would if a suspect's person were being searched.

¶ 82. Here, two officers testified that as they approached Johnson's vehicle he leaned forward to the extent that much of his head and shoulders disappeared from view, and that his movement was considered "furtive" because it appeared he was concealing something underneath the front seat. Both officers also testified that in their experiences such a movement can occur when the occupant of the vehicle is placing a weapon under the seat.

¶ 83. The officer's conclusion that Johnson's furtive movement could have resulted from placing a weapon under the seat was reasonable because they

719

accurately described what Johnson did, and they had past experience with similar movements of occupants who had secreted a weapon under the front seat. Accordingly, the officers reasonably believed that Johnson's actions had the potential to create a dangerous situation upon his re-entry into the vehicle because he would have access to any weapon he placed under the front seat.

¶ 84. The officers had to make a quick decision about their own safety after they decided not to arrest Johnson. They had two choices. They could ignore what they believed to be Johnson's reaching under the front seat and also ignore their experiences as law enforcement officers as to what such a reaching could mean or they could conduct a limited search of the area of Johnson's vehicle into which he would re-enter. They chose the latter course of action.

¶ 85. The majority concludes that the limited search of the passenger compartment of Johnson's vehicle was not reasonable because Johnson could have been trying to retrieve his driver's license, or picking up a fast food wrapper from the floor or several other innocuous acts. Majority op., ¶ 43. While I have no quarrel with the majority's discussion of what Johnson "could" have been doing, the discussion demonstrates only that the majority of this court, none of whom have any experience conducting traffic stops, is merely substituting its judgment for that of two experienced officers. But more importantly, the majority opinion does not explain why the officers' belief was not reasonable as is required. *Stout,* 250 Wis. 2d 768, ¶ 31.

¶ 86. That Johnson's furtive movement could have an innocent explanation is not persuasive because, as this court has explained, a suspicious circumstance, such as a furtive movement, "by its very nature" is an

720

ambiguous circumstance. *See State v. Anderson,* 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990). Simply because Johnson's furtive movement could have resulted from something other than concealing a weapon, it does not follow that the officers' belief that Johnson's movement had the potential of weapon concealment, was unreasonable. *Stout,* 250 Wis. 2d 768, ¶ 31 (concluding that while there may have been an innocent reason for Stout's furtive movement, it was also reasonable to conclude that he was reaching for a weapon).[5]

¶ 87. As the United States Supreme Court has explained, traffic stops are very dangerous for law enforcement personnel. *Long,* 463 U.S. at 1048. Therefore, when an officer releases a suspect who has made a furtive movement that could have been due to securing a weapon under the front seat, the officer must make a quick decision about whether to ignore what he has seen and his training and experience about the import of that observation or he can secure his own safety and that of others by conducting a limited search of the passenger compartment of the vehicle to which the suspect may return. In situations such as this case presents, when the officer opts for safety, no constitu-

---

[5] The majority opinion suggests that my criticism of its reasoning and conclusion that Johnson's furtive movement as the officers walked to his vehicle did not reasonably suggest that he could have been placing a weapon or drugs under the front seat is a request that the majority "abdicate its constitutional function." Majority op., ¶ 44 n.16. That is mere hyperbole. All I am requesting is that the majority opinion analyze the facts and determine what a reasonable *police officer* would have believed under the circumstances. An officer's experience bears on what is reasonable for him to believe, and, given the fluid nature of a traffic stop and its inherent dangers to police officers, their belief, given the facts herein presented, was reasonable. *See Michigan v. Long,* 463 U.S. 1032, 1047 (1983).

tional right is violated because the search is reasonable under the circumstances. Because the majority opinion does not balance the officer's need for the search with the level of intrusion on Johnson's privacy, it errs in concluding the vehicle search was not lawful. In so doing, it unnecessarily increases the risk of harm for officers who, in the future, choose the lack of action that the majority opinion requires.

## III. CONCLUSION

¶ 88. In conclusion, because the circuit court's finding of historic fact that Johnson consented to the search of his vehicle cannot be overturned, as it is not clearly erroneous, and because Johnson's agreeing to the proposed search was not acquiescence of the type that affected the voluntariness of his consent, the majority errs in concluding that Johnson did not consent to the search of his vehicle. In addition, it errs when it substitutes its judgment for that of law enforcement about the reasonable import of Johnson's furtive movement as the officers approached his vehicle. Accordingly, because rectifying either of these errors will result in affirming Johnson's conviction, I respectfully dissent.

¶ 89. I am authorized to state that Justice JON P. WILCOX joins this dissent.