COURT OF APPEALS
DECISION
DATED AND FILED

March 13, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2022AP161-CR**

**STATE OF WISCONSIN**

Cir. Ct. No.  2019CF77

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DAMIAN L. HAUSCHULTZ,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Manitowoc County: JERILYN M. DIETZ, Judge. *Affirmed.*

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Damian L. Hauschultz appeals a judgment of conviction entered upon his guilty plea to one count of first-degree reckless homicide in connection with the death of his seven-year-old foster brother, Ethan. Hauschultz contends the circuit court erred when it denied his motion to suppress statements he made to investigators during three interviews, all of which occurred in the hours after Ethan was taken to the hospital with fatal injuries. Hauschultz's arguments in this regard are twofold: first, he contends that his statements were made during custodial interrogation without the benefit of *Miranda* warnings;[1] and second, he argues his statements were involuntary considering in particular his young age—fourteen at the time of Ethan's death.

¶2 We conclude that Hauschultz was not subjected to custodial interrogation for purposes of *Miranda* during his first interview at the hospital and during his second interview at the sheriff's department a short time later. We also conclude that Hauschultz's statements during the first and second interviews were made voluntarily. Accordingly, the circuit court properly denied Hauschultz's suppression motion as to those two interviews.

¶3 Whether Hauschultz was subjected to custodial interrogation during the third interview—which occurred in the early morning hours after Ethan had died—is a much closer question. Ultimately, we need not resolve that issue. Even assuming the early-morning interview was custodial in nature, the State has demonstrated that any error in admitting the statements from that interview was harmless. Hauschultz was resistant to answer any questions regarding the incident during that interview, and what information he did give authorities was almost

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

entirely duplicative of information Hauschultz had disclosed during the earlier interviews. Accordingly, there is no reasonable possibility that any error would have affected Hauschultz's decision to plead guilty.

## BACKGROUND

¶4 On the afternoon of April 20, 2018, Ethan's foster parents, Timothy and Tonya,[2] transported Ethan to the emergency department at Holy Family Memorial Medical Center in Manitowoc. Hauschultz—who is Tonya's son and Timothy's stepson—accompanied them. Ethan was unresponsive, had an extremely low body temperature, and had numerous bruises and injuries on his body. Life-saving efforts were unsuccessful, and he was pronounced dead at 9:22 p.m. The official cause of death was identified as hypothermia due to environmental cold exposure, with other significant conditions being blunt force injuries to the head, chest and abdomen.

¶5 Shortly after Ethan arrived at Holy Family, Lieutenant Dave Remiker began gathering basic information from Ethan's foster family. Remiker learned that the injuries occurred outdoors at the Hauschultz home at a time when Hauschultz was supervising Ethan and three other children, including Ethan's twin brother Adam. Timothy and Tonya were not home at the time.

---

[2] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2021-22), we use pseudonyms to refer to Ethan's family members with the exception of Timothy, against whom charges relating to the incident remain pending.

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶6 Remiker decided he wanted to speak with Hauschultz privately. Hauschultz and his mother agreed, and Hauschultz was cooperative with Remiker. Remiker and Hauschultz moved from the family room to a room across the hall to conduct their conversation.[3]

¶7 This first interview lasted approximately eight minutes. Hauschultz initially denied he had done anything to Ethan, adding that he could not explain the bruises and injuries on Ethan's body. He later told Remiker that he, Ethan, and Adam were carrying wood around the yard at Timothy's direction for two hours as an "extreme punishment" for disobedience. Hauschultz stated he was in charge of this punishment while Timothy was absent, and he acknowledged that he had slapped, swatted and prodded Ethan with a stick to get him moving. The children who were not subject to this punishment watched.

¶8 Hauschultz told Remiker that during the punishment, he found Ethan slumped over a piece of wood. He claimed he and some of the other children had thrown snow on Ethan, adding that they did this because they thought Ethan was messing around. Hauschultz said he wanted to "get [Ethan] really cold" to force him to keep moving. Hauschultz admitted to taking off Ethan's boots and described how he created a "little coffin of snow," packing Ethan to his shoulders in about eighty pounds of wet snow.

¶9 After the first interview, Hauschultz agreed to a second interview at the nearby sheriff's department. Timothy gave permission for a second interview, and Hauschultz was transported in an unmarked vehicle by detective Christine

---

[3] Remiker made an audio recording of the interview on his cell phone. The second and third interviews were video recorded.

Bessler. Ethan was still alive at the time. The second interview began shortly before 6:00 p.m. and lasted approximately two and one-half hours. It took place in the department's "soft" interview room, which is arranged like a living room with couches. Hauschultz was seated on a couch near the door for the entire duration of the interview.

¶10 At the inception of the second interview, Bessler told Hauschultz that he should tell her if he no longer wanted to talk. Hauschultz responded that the situation was ironic because the police liaison at his school had just taught a special unit in his social studies class about constitutional rights. Hauschultz explained that he lived with his mother, stepfather, and four other children, including Ethan and Adam. Hauschultz and Bessler then spent approximately twenty minutes discussing Hauschultz's family, living arrangements, education and extracurricular activities. They then moved on to discuss how Timothy dealt with misbehavior in the household.

¶11 Hauschultz explained that as punishment for misbehavior, Timothy required the children to carry wood in the yard for two hours per offense—an activity Hauschultz described as "boring, hard, stupid work." Timothy assigned each child their own log, and they would have to complete "laps" carrying their piece of wood. This punishment would occur during any season and during all weather conditions, including rain and snow. Hauschultz estimated the piece of wood he had to carry was about twelve pounds. Hauschultz estimated that seven-

year-old Ethan's piece of wood, by contrast, weighed between thirty-five and forty pounds.[4]

¶12    Hauschultz stated that if one of the children refused to carry wood, there would be more punishment, including by extending the amount of time the child had to carry wood outside or by assigning substantial household chores. Hauschultz sometimes had to physically "drag them" out to carry wood.  It was Hauschultz's opinion that Timothy had not yet "broke" the twins, adding that they were "still doing whatever they want and just dealing with the punishment." Carrying wood was Timothy's "go to" punishment, and it started when the twins came to live with them.

¶13    Hauschultz made statements clearly indicating his resentment for Ethan and Adam.  He said the family was "all happy and fine" until Timothy said the twins were moving in with them.  Hauschultz found the twins "annoying" even before that time, and when they came to live with him, they "[drove him] nuts." Hauschultz admitted he would become physical with them at times; for example, he would "literally take [his] foot [and] kick them in their rear end" if they came into his room.  When asked if this was "older brother stuff" or if he really disliked the twins, Hauschultz said it was the latter, though he later told Bessler he cared about their well-being.  Hauschultz felt that carrying wood was not enough punishment for the twins' misbehavior.

---

[4] Police subsequently weighed the piece of wood Ethan was forced to carry.  It was 44.4 pounds.  Ethan weighed approximately 60 pounds.  During the second interview, Hauschultz described the twins as "tiny, scrawny, little things" who were "weak" and "fragile" and hated physical labor.

¶14    Hauschultz could not recall why Ethan was being punished on April 20th, but Hauschultz was in the final days of his own punishment for failing to memorize Bible verses. Timothy left immediately after lunch to pick up Tonya from technical college. He gave directions for Hauschultz to supervise the twins' punishment, which was to last until 3:00 p.m. unless they refused to carry wood, in which case they were to stay outside. The yard was full of melting snow; Hauschultz described it as a "soupy, puddly slush mix." The twins were wearing jeans with holes in them, sweatshirts, winter jackets, snow boots, fabric gloves and hats when they started out that afternoon.

¶15    Hauschultz explained that as the twins made their laps, he would poke or prod them with a stick if they dropped their wood, which occurred very often. Hauschultz stated he would usually target their torso or rear end with the stick and he would poke them hard enough to make them feel it but not hard enough to seriously injure them. Hauschultz estimated he poked them "a few hundred times"—the vast majority of which were directed at Ethan because Hauschultz perceived that he was being defiant. Hauschultz acknowledged that he was irritated he had to be outside carrying wood and supervising the boys, and he became even more irritated because they were making things difficult.

¶16    As the punishment progressed, Hauschultz could tell that Ethan in particular was physically exhausted. He frequently dropped his wood piece. Five or six times, when Ethan went to pick up the log, he could not keep his footing, and he fell backward. Each time, the log landed on Ethan's chest and "smushed" him. Ethan fell forward on top of the log an additional three or four times. Hauschultz told Bessler he did not help Ethan up when Ethan fell because he did not feel bad for Ethan.

¶17 At approximately 2:30 p.m., Hauschultz noticed that Ethan was lying motionless with the log just under his chin. Hauschultz stated he pinched Ethan to get him moving, but Ethan was "stiff and statue-like." When Ethan did not respond, Hauschultz and the other children pulled him off the log and laid him down on the ground. As he did in the first interview, Hauschultz explained how they made Ethan "a little coffin of snow" by covering Ethan except for his face. He could hear Ethan softly whining and could see that Ethan had a bloody face. Hauschultz also saw that Ethan's eyelids were slowly opening and closing, and his pupils appeared hazy. Ethan would occasionally raise his arm, and Hauschultz would rebury it. Eventually, Ethan stopped moving.

¶18 Hauschultz told Bessler that after he had buried Ethan in snow, he poured water over him to "solidify" or "icify" him. Hauschultz left Ethan buried in what he estimated was "eighty pounds of wet, soggy snow" for twenty to thirty minutes. Upon further questioning, Hauschultz admitted that he had also given Ethan a "facewash," which Hauschultz described as where someone "shove[s] their face down in the snow and wipe[s] it around."

¶19 Hauschultz went to check on Ethan after he completed his two hours of carrying wood. He found Ethan non-responsive lying in a puddle of water under the snow. Hauschultz explained that he thought Ethan was faking, so he dragged Ethan's stiff body to his piece of wood, positioned Ethan so he was lying over it, and told Ethan to finish his punishment. He noticed Ethan was barely breathing, so he pressed down on Ethan's back and compressed his chest against the log in an effort to clear his lungs. Hauschultz then called Timothy and told him Ethan was "playing dead." Hauschultz did not take Ethan into the house.

¶20 Hauschultz told Bessler Timothy arrived home with Tonya and went into "emergency mode" when he saw Ethan's condition. Hauschultz stated he was "freaked out," so he went to "sit on the porch, [with a] 'what in the world have I done'-type feeling." Hauschultz told Bessler he did not mean to harm Ethan, and he was not even sure he had done anything to harm him. When asked whether Ethan felt cold on the way to the hospital, Hauschultz responded he felt very cold. Hauschultz then volunteered that maybe the cold "seeped through to [Ethan's] core," and Hauschultz said that he knew if someone's "core temperature changes a certain amount it doesn't work right anymore." Hauschultz then said he started feeling guilty, as if he did something wrong.

¶21 Bessler had Hauschultz draw a picture of the yard and where the various events of the day had occurred. The interview finished when Timothy arrived at the department and asked to see Hauschultz. Hauschultz left the department with Timothy after the two spoke privately.

¶22 Ethan was pronounced dead after the second interview concluded. The Manitowoc County Department of Human Services then requested interviews with Hauschultz and the other children. Timothy and Tonya drove the youths to the sheriff's department. The children were taken into a conference room and were interviewed individually over several hours by Bessler and social worker Laura Zimbler. Timothy and Tonya did not accompany the children into the building.

¶23 Hauschultz's third interview commenced at 2:43 a.m. on the morning following Ethan's death. It lasted approximately one hour and took place in the same "soft" room as the second interview. At the inception of the interview,

9

Hauschultz stated that he had been instructed by Timothy not to say anything more without an attorney present.

¶24     Nonetheless, Bessler pressed Hauschultz for more information about Ethan's injuries.  Bessler repeatedly and pointedly emphasized that Ethan was dead, imploring Hauschultz to explain the bruises on Ethan's body.  But each time Bessler asked for details of the prior day's events, Hauschultz sat quietly and refused to answer, informed Bessler that he did not think he should talk, or gave curt answers that were almost entirely repetitive of his statements during earlier interviews.

¶25     Hauschultz did respond to general questions about his activities and feelings.  He stated he wanted things to go back to normal, then he described his typical day.  He said he was always angry and talked about a "burning inside," but he denied that those feelings had manifested in the form of physical violence towards the twins.  Hauschultz spoke with distain for Timothy's "dictatorship" in the household, and he discussed his sadness about what had happened to Ethan.  He stated he did not feel responsible for Ethan's death, but he did regret not accepting him into the family.

¶26     Bessler repeatedly attempted to leverage these general questions into a more specific discussion of Hauschultz's role in Ethan's death.  For example, she asked Hauschultz to tell her about the mud puddle Ethan was laying in.  Hauschultz responded, "It's a puddle of mud."  She asked how Ethan ended up in it.  Hauschultz responded that everyone had covered him in snow, adding, "Nothing I didn't already tell you."  Bessler continued pressing the matter, but Hauschultz refused to answer, including when asked if he became physical with Ethan.  When Bessler said she wanted to hear his side of the story, Hauschultz

responded that he was not supposed to say anything, and he thought it was in his best interest to follow that advice.

¶27    Bessler tried again a short time later, stating that she believed what Hauschultz had told her during the prior interview but thought he had left a few things out.  Hauschultz was visibly emotional during this line of questioning, but he did not offer further details of the incident.  Eventually, he responded, "I know what I should say, but me, like in my head, is saying don't say it, but then I want to, but then it doesn't, and it's just making me not.  Like mentally, I know, it's a weird … my brain is confusing itself about what it should do."  He then sat silent.

¶28    While Hauschultz largely refused to discuss the prior day's events, he did answer a few questions by repeating information he had already given.  Hauschultz repeated that Ethan did not want to carry wood and did not seem to care about his punishment.  Bessler then asked how Hauschultz would make him carry wood, to which Hauschultz responded, "Usually how I told you, with the stick."  He declined to answer a further question about whether that had occurred with Ethan on the day prior.

¶29    Bessler then confronted Hauschultz with the information she had gleaned from interviews with the other children.  After Hauschultz denied restraining Ethan when he was in the snow, Bessler told Hauschultz that was "a little different than what I'm hearing from others," adding that there were "still a few gaps that I know you can fill in."  Hauschultz declined to answer without a lawyer.

¶30    Bessler tried again, informing Hauschultz the other children had said Hauschultz got a "little rough" with Ethan, including standing on him.  Hauschultz denied standing on Ethan, but admitted that when he was giving Ethan a

"facewash" he had placed a foot on Ethan. As he had in the first interview, Hauschultz also said that he took Ethan's boots off just before the children buried him in the snow, because they were trying to make him "more cold." The interview then concluded, and Hauschultz was allowed to go home.

¶31 Hauschultz was later charged with reckless homicide, three counts of physical abuse of a child—intentionally causing bodily harm, and three counts of substantial battery. The defense filed a motion to suppress the statements given during three interviews,[5] contending Hauschultz was subjected to custodial interrogation at the hospital and at the sheriff's department without being given *Miranda* warnings.[6] The defense also asserted the statements Hauschultz gave during the interviews were not voluntary.

¶32 The circuit court held a *Miranda-Goodchild*[7] hearing over the course of three days, the testimony from which is described further below. Afterwards, the court denied the suppression motion. It concluded that Hauschultz was not subjected to custodial interrogation during any of the interviews so as to necessitate *Miranda* warnings. It also concluded that Hauschultz's statements were voluntary and were not elicited in violation of his due process rights.

¶33 Following the circuit court's suppression determination, Hauschultz reached a plea agreement with the State. He agreed to plead guilty to the reckless

---

[5] Statements made during a subsequent fourth interview months later with counsel present are not at issue in this appeal.

[6] *See Miranda*, 384 U.S. 436.

[7] *See State v. Jiles*, 2003 WI 66, ¶25, 262 Wis. 2d 457, 663 N.W.2d 798 (citing *Miranda* and *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 133 N.W.2d 753 (1965)).

homicide charge, with the remaining charges dismissed and read in. The State agreed to recommend between twelve and seventeen years of initial confinement, with the defense free to argue. The circuit court accepted Hauschultz's plea and sentenced him to twenty years' initial confinement and ten years' extended supervision. Hauschultz now appeals.

## DISCUSSION

¶34 Hauschultz appeals the denial of his suppression motion, asserting that his statements were elicited during custodial interrogation in violation of *Miranda* and that his statements were involuntary. Because Hauschultz's voluntariness analysis relies heavily on the absence of *Miranda* warnings, we consider these issues together. We then proceed to consider whether Hauschultz is entitled to the relief he seeks—a remand to the circuit court with directions to allow plea withdrawal.

### I.      *Miranda* and Voluntariness

¶35 Whether a statement should be suppressed is a question of constitutional fact. *State v. Johnson*, 2007 WI 32, ¶13, 299 Wis. 2d 675, 729 N.W.2d 182. We review the circuit court's historical findings of fact using the "clearly erroneous" standard of review.[8] *Id.* The application of constitutional principles to those facts presents a question of law that we review independently. *Id.*

---

[8] Two of the three interviews at issue were video recorded. Thus, we are in the same position as the circuit court to determine what occurred during the interrogations and independently make that determination. *State v. Rejholec*, 2021 WI App 45, ¶17, 398 Wis. 2d 729, 963 N.W.2d 121.

¶36 The federal and state constitutions each require that law enforcement officers inform suspects of their rights to remain silent and to have an attorney present during custodial interrogations. *State v. Bartelt*, 2018 WI 16, ¶27, 379 Wis. 2d 588, 906 N.W.2d 684. It is undisputed that Hauschultz was not provided *Miranda* warnings during any of the relevant interviews. The parties dispute whether Hauschultz was in custody during each of the interviews, such that *Miranda* warnings were necessary for the statements to be admissible.

¶37 A custodial interrogation is one that occurs where "there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest." *Id.* (quoting *State v. Lonkoski*, 2013 WI 30, ¶6, 346 Wis. 2d 523, 828 N.W.2d 552). "A person is in 'custody' if under the totality of the circumstances 'a reasonable person would not feel free to terminate the interview and leave the scene.'" *Lonkoski*, 346 Wis. 2d 523, ¶6 (quoting *State v. Martin*, 2012 WI 96, ¶33, 343 Wis. 2d 278, 816 N.W.2d 270).

¶38 The test to determine whether a person is in custody for purposes of *Miranda* is an objective one. *Bartelt*, 379 Wis. 2d 588, ¶31. In ascertaining how a reasonable person would have gauged his or her freedom of movement, we consider the totality of the circumstances. *Id.*, ¶32. Relevant factors include the purpose, location and duration of the questioning; the degree of physical restraint used by the police; whether the person was moved to another location for purposes of the interview; the number of officers involved; the statements made during the interview; and whether the person was allowed to leave at the conclusion of the interview. *Id.*; *Howes v. Fields*, 565 U.S. 499, 509 (2012).

¶39 The restriction-on-movement test is a necessary but not sufficient condition for *Miranda* custody. *Bartelt*, 379 Wis. 2d 588, ¶33. If we conclude

that the person's freedom of movement has been curtailed to a degree associated with formal arrest, we must also assess whether the specific circumstances presented a "serious danger of coercion." *Id.*

¶40    We analyze voluntariness in tandem with the *Miranda* issue as it pertains to these interviews.  The federal and state constitutions require a statement to be voluntary to be admissible into evidence.  *State v. Vice*, 2021 WI 63, ¶28, 397 Wis. 2d 682, 961 N.W.2d 1.  A defendant's statements are voluntary if they are "the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by … the State exceeded the defendant's ability to resist."  *Id.*, ¶29 (quoting *State v. Davis*, 2008 WI 71, ¶36, 310 Wis. 2d 583, 751 N.W.2d 332).  The State bears the burden of proving voluntariness by a preponderance of the evidence.  *Id.*

¶41    A threshold question for the voluntariness analysis is whether the defendant's statements have been obtained through the use of coercive or improper police practices.  *Id.*, ¶31.  "[W]ithout coercion, there is no involuntariness."  *Id.*, ¶35.  Establishing coercion is a "high bar for a defendant to surmount."  *Id.*, ¶32.  *Vice* provides many examples of coercive police practices, including physical violence, sleep and food deprivation, and threats, *id.*, ¶34, though in particular cases more subtle coercion may violate due process, *id.*, ¶32; *see also* *State v. Jerrell C.J.*, 2005 WI 105, ¶19, 283 Wis. 2d 145, 699 N.W.2d 110 (observing that police conduct need not be egregious or outrageous to be coercive).

¶42    Once a defendant has established coercive or improper police practices, we must ascertain whether those practices produced an involuntary

confession. "That analysis involves balancing the suspect's personal characteristics, such as age, intelligence, physical and emotional condition, and prior experience with law enforcement, against any pressures imposed upon him by police." *Vice*, 397 Wis. 2d 682, ¶30. In evaluating whether the defendant's will was overcome, we consider the totality of the circumstances. *Jerrell C.J.*, 283 Wis. 2d 145, ¶20.

¶43 We address two prefatory matters before moving on to consider the particulars of the interviews at issue. First, Hauschultz's analysis of the voluntariness criterion gives the absence of *Miranda* warnings an almost talismanic quality. The custody analysis was not designed for this purpose. *Cf. Howes*, 565 U.S. at 509. To be sure, the absence of *Miranda* warnings is a factor to consider when assessing voluntariness. *See State v. Hoppe*, 2003 WI 43, ¶29, 261 Wis. 2d 294, 661 N.W.2d 407. *Miranda* warnings can certainly help dispel the coercive effect of questioning. *See Bartelt*, 379 Wis. 2d 588, ¶27 ("These warnings are required because '[t]he circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of [the suspect].'" (quoted source omitted)). But the Supreme Court has made clear that their absence is merely one factor to consider, albeit a "significant" one. *See Davis v. North Carolina*, 384 U.S. 737, 740 (1966).

¶44 Second, the State concedes that Hauschultz's age—fourteen years old during the relevant time period—is a relevant consideration for purposes of both *Miranda* custody and voluntariness. This concession is well-taken, as courts have long recognized the importance of age in determining both whether a person is in custody, *see J.D.B. v. North Carolina*, 564 U.S. 261, 265 (2011), and whether a confession is voluntary, *Jerrell C.J.*, 283 Wis. 2d 145, ¶25. Hauschultz's age is a factor weighing both in favor of a determination of custody

and against a determination of voluntariness. We proceed using the appropriate "special caution" given to interrogations involving juveniles. *Id.*, ¶21.

¶45 The Wisconsin Innocence Project, et al., and Juvenile Law Center, et al., appear as amici and have filed briefs in support of Hauschultz's appellate arguments, focusing in particular on adolescent brain development and trauma as it pertains to the *Miranda* and voluntariness issues. The essence of their arguments is that tactics that would not typically be regarded as coercive during adult interrogations can be coercive for juveniles, particularly juveniles who have endured traumatic events. They concur with Hauschultz's assessment of the interviews as both violating *Miranda* and producing an involuntary confession.

¶46 We agree with the general principle that custody and voluntariness are assessed differently for juveniles and adults. *See J.D.B.*, 564 U.S. at 264-65 ("It is beyond dispute that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave."). Indeed, that principle is reflected in the "special caution" the case law directs us to give the methods of interrogation when considering unaided interviews of children. *See State v. Moore*, 2015 WI 54, ¶57, 363 Wis. 2d 376, 864 N.W.2d 827. Nonetheless, as set forth below, even in light of Hauschultz's age, the first and second interviews lacked the degree of coerciveness necessary to establish a due process violation.[9]

---

[9] Much of the amici briefs are directed towards the police conduct during the third interview. As set forth below, we need not make a determination of custody or voluntariness regarding that interview.

17

¶47 As the circuit court recognized, Hauschultz's personal characteristics remained "fairly static throughout" the interviews; we set them forth here before proceeding to consider the specific circumstances of each interview. Hauschultz was in the eighth grade. He concedes he is a "smart child;" he told Bessler he was in accelerated math and English. He was expecting to attend college to be a petroleum engineer, which he told Bessler would require four years of learning about mechanical engineering, mathematics, chemistry—matters Hauschultz described as "tedious stuff." We agree with the circuit court that Hauschultz's "intelligence is apparent when he speaks in these interviews."

¶48 There was no indication that Hauschultz was suffering from physical or mental impairments that would have affected the *Miranda* or voluntariness analyses.[10] It does not appear Hauschultz was particularly susceptible to coercion. In fact, Hauschultz told Bessler the situation was "ironic" because he had just completed a special social studies unit about constitutional rights taught by his school's police liaison officer. Hauschultz had no prior experience with the juvenile justice system.

¶49 The circuit court further determined that Hauschultz did not appear confused or have difficulty understanding what was going on. The interview recordings confirm the court's finding that Hauschultz did not have "difficulty with the language used during any of the interviews" and that he "spoke freely and fluently with everyone who interviewed him."

---

[10] Hauschultz said he had a kidney issue that kept him from playing football and baseball, but he was a part of the golf team. Hauschultz told Bessler, "I'm fine, I just get tired out."

A.    *Interview One*

¶50    We first consider whether Hauschultz was subjected to **Miranda** custody during his first interview, which took place at the hospital in the afternoon while Ethan was being treated. The eight-minute interview took place in a small intake room across the hall from the family room. Tonya and Hauschultz both consented to allowing Remiker to speak privately with Hauschultz. Hauschultz did not ask to have anyone with him and was very cooperative.

¶51    Hauschultz was not handcuffed or restrained during the interview. At no point did he ask to stop talking or request that anyone join him in the room. The door to the room was either closed or slightly ajar, and Remiker did not lock it. Remiker was wearing street clothes. The interview ended when Remiker received a phone call.

¶52    Hauschultz characterizes the circumstances as isolation in a "high-stress" environment with an armed police officer who used "common, and coercive, interrogation ploys." As set forth above, any "isolating" features of the interview occurred with the consent of Hauschultz and his mother, who the circuit court found was readily available to him. There is no indication that Remiker ever overtly displayed his firearm. And, as Hauschultz acknowledges, police "do not generally predominate" in the medical setting—and did not do so here.

¶53    Remiker was tasked with gathering more information about what caused Ethan to arrive at the hospital in serious medical distress. At that time, police had very little information about what had occurred. Remiker encouraged Hauschultz to "be honest" and explain what caused the marks and bruises on Ethan's body. The discussion was "calm, conversational, and pleasant." We perceive nothing about the nature of the questioning during the short interview that

would have caused a reasonable person in Hauschultz's position to believe that he was in custody.

¶54 Relatedly, we conclude Hauschultz's statements during the hospital interview were made voluntarily. Hauschultz fails to persuade us that there were any improper or coercive aspects of the interview. He emphasizes that he was "separated from his mother [and] … questioned in a small room by an armed law enforcement officer," comparing his interview with one deemed to be custodial in *United States v. Slaight*, 620 F.3d 816 (7th Cir. 2010).

¶55 Hauschultz's comparison of his situation with the defendant's in *Slaight* does him no favors. In *Slaight* the defendant, after being forcibly removed from his home, was interviewed in a tiny police station room filled to capacity with men and furniture, prompting the district court judge to remark that it was the smallest interrogation room he had ever seen in his forty years of experience and "should never, ever be used to take voluntary statements." *Id.* at 819. Even setting aside the fact that *Slaight* was about *Miranda* custody (not voluntariness), the facts here are far less indicative of a coercive environment.

¶56 Additionally, Hauschultz considerably overstates the matter of his separation from his mother. In *Jerrell C.J.*, which Hauschultz relies on, police outright refused the juvenile's several requests to speak with his parents during the course of a five-hour interrogation. *Jerrell C.J.*, 283 Wis. 2d 145, ¶10. Our supreme court held that law enforcement's refusal to call parents for the purpose of depriving a juvenile of the opportunity to receive advice and counsel is strong evidence that coercive tactics were used to elicit incriminating statements. *Id.*, ¶43. But here, Hauschultz and his mother both agreed that Remiker could speak with Hauschultz alone, and Hauschultz was never denied a request to speak with

his parents. Indeed, he never expressed any interest in conferring with them during the course of questioning.

¶57 Hauschultz also argues that Remiker used "psychological pressure in the form of demands that he be honest and false reassurance that no one would get in trouble based on his statements." Minimization, false reassurance and suggestions that harm to a victim may have been an accident are "tactics that courts commonly accept." *Moore*, 363 Wis. 2d 376, ¶64. Notably, the *Moore* defendant's confession was deemed to be voluntary even though those tactics were applied to a fifteen-year-old of below-average intellect during questioning that lasted approximately twice as long as the questioning here. *See id.*, ¶¶58-65.

¶58 Hauschultz counters that law enforcement's pleas for truthful statements were regarded as coercive in *Jerrell C.J.* We are unpersuaded. The supreme court's analysis of the totality of the circumstances in that case revealed: (1) that the questioning involved "continually challenging the juvenile's statement and accusing him of lying" using a frightening voice; (2) that police interrogated the defendant in this fashion for five hours; and (3) that police denied his repeated requests to speak with family members. *Id.*, 283 Wis. 2d 145, ¶¶30-35. Based upon those other factors, we hesitate to adopt Hauschultz's reading of *Jerrell C.J.* as exalting the significance of police entreating honesty from suspects.

¶59 In contrast to the *Jerrell C.J.* interview, the interview here was a preliminary information-gathering interview. The circuit court described it as a "comfortable, calm, quick discussion." Hauschultz was not handcuffed or restrained, he was interviewed with the consent of his mother, and his mother was readily accessible to him. Remiker asked Hauschultz to explain Ethan's condition,

and his questioning included the possibility that someone else in the household had harmed Ethan. He did not repeatedly accuse Hauschultz of lying or otherwise attempt to wear down his defenses using psychologically coercive tactics. The totality of the circumstances demonstrates that Hauschultz's statements during the hospital interview were voluntary.

### B. *Interview Two*

¶60 We reach the same conclusions regarding the second interview. Hauschultz describes this as a "paradigmatically custodial police interview," emphasizing that the interview took place at the sheriff's department, Hauschultz was transported there by Bessler, and he did not have a parent with him for the duration of the approximately two-and-one-half-hour interview. To be sure, these factors—along with Hauschultz's age—are relevant to the *Miranda* custody analysis and indicative of a custodial interview.

¶61 Yet Hauschultz ignores other factors suggesting that the interview was of a non-custodial nature. Hauschultz and Timothy had both agreed to the interview and to Bessler transporting Hauschultz to the sheriff's department a few minutes away. Bessler drove a "plain grey Chevy" that had no divider or "cage" between the front and rear seats. Bessler drove Hauschultz there because he could not drive a car.[11] Hauschultz was not handcuffed or restrained during the ride or at any point during the interview.

---

[11] Timothy and Tonya presumably wanted to stay with Ethan, who was at that point still alive.

¶62 Though Hauschultz was not provided full *Miranda* warnings, Bessler told him at the outset of the interview that she would answer any questions he had and that he could decide at any time that he no longer wanted to talk. Bessler reassured Hauschultz that he had nothing to fear from her. The interview took place in a comfortable room with furniture; Hauschultz was seated on the couch for the entire interview.

¶63 Hauschultz told Bessler he did not care if the interview room door was open or closed. Bessler said she would leave it open unless outside conversation became distracting; Hauschultz agreed that was fine. The door was open for about five minutes before another person started speaking loudly in the hallway outside and Bessler closed it. Thereafter, the conversation was congenial, calm and at times even lively as Hauschultz described his family, school, extracurricular activities and living arrangements.

¶64 The interview was undoubtedly lengthy, and the door was closed for much of it. However, Hauschultz did not ask for his parents or an attorney, nor did he ask—or try—to leave. He was offered and accepted coffee several times during the interview; there were breaks in excess of ten minutes. Hauschultz was not denied any requests for water or to use the bathroom, or other similar requests.

¶65 About two hours into the interview, Bessler told Hauschultz that Timothy had arrived at the sheriff's department. Hauschultz waited alone in the room while Bessler went out to meet him. Timothy asked to speak with Hauschultz privately and was allowed to do so. Afterwards, he left with Hauschultz with no resistance from authorities.

¶66 The totality of the circumstances demonstrates that Hauschultz was not subjected to *Miranda* custody. The interview was not marked by the use of

restraints, the atmosphere was relaxed and comfortable, the questioning was conversational, Hauschultz was not denied any creature comforts, he was expressly told at the outset that he could terminate the interview, and he did in fact leave when his family arrived. Although Hauschultz's age, the location and length of the interview, and the transportation method used to bring him there are factors suggesting custodial interrogation, on balance a reasonable person in Hauschultz's position would have felt free to terminate the interview and leave.

¶67 We are unpersuaded by Hauschultz's reliance on *State v. Dionicia M.*, 2010 WI App 134, 329 Wis. 2d 524, 791 N.W.2d 236. There, a truancy officer picked up the juvenile defendant and asked her to get into the back seat of his squad car. *Id.*, ¶2. The doors to the squad were locked. *Id.* During the ride back to school, the officer questioned the defendant about her suspected involvement in a battery case. *Id.*, ¶10. We concluded the defendant was in *Miranda* custody from the moment she entered the squad. *Id.*

¶68 Hauschultz endorses this "commonsense analysis," and he urges us similarly not to "belabor the factors supporting custody" or to "delve deeply into the absence of other factors that might support custody (like handcuffs or a show of force)." But as set forth above, those factors are relevant here, even though they might not have been particularly informative on the question of custody for a juvenile being interrogated about a crime in a locked and moving patrol car. Nothing in *Dionicia M.* rescinds this court's obligation to look to the totality of the circumstances to determine *Miranda* custody.

¶69 Turning to voluntariness, again the absence of coercive or improper police tactics during the second interview dooms Hauschultz's arguments. Hauschultz argues the interview was the classic "incommunicado interrogation"

that the *Miranda* court described as "destructive of human dignity." *See Miranda v. Arizona*, 384 U.S. 436, 457 (1966). This description of some police interviews was certainly an impetus for the Supreme Court's adoption of a constitutional rule mandating that a person be advised of their rights prior to custodial questioning.

¶70 But another justification for adopting *Miranda* safeguards was the perception that the due process voluntariness inquiry was not sufficiently protective of a defendant's constitutional rights. In other words, the Supreme Court viewed *Miranda* warnings as necessary in part because the coercive elements present during a custodial interrogation as a general matter are not sufficient to overcome a defendant's will—that is, they would not render a confession "involuntary in traditional terms." *Id.*[12] Whatever might be said about the voluntariness of the interrogations at issue in *Miranda*, the relatively calm, relaxed and conversational interview in this case was not punctuated by any impermissibly coercive practices.

### C.     *Interview Three*

¶71 Whether Hauschultz was in *Miranda* custody during the third interview is a much closer question. His age and the location of the interview— the sheriff's department—remain factors that support a custody determination.

---

[12] Hauschultz appears to contend that the coercion required to establish involuntariness is created by the mere fact that an interview occurred at a police department. He relies in this respect on *State v. Bartelt*, 2018 WI 16, ¶44, 379 Wis. 2d 588, 906 N.W.2d 684—a *Miranda* custody case. While a stationhouse interview is certainly indicative of custody for *Miranda* purposes, law enforcement's decision to conduct an interview at that location is typically not regarded as a coercive or improper police method for purposes of the voluntariness inquiry. *See State v. Vice*, 2021 WI 63, 397 Wis. 2d 682, 961 N.W.2d 1 (concluding the defendant's statements were not the product of coercive police practices despite the interrogation occurring at a police station).

Whereas the second interview began in the evening, the third interview occurred in the wee hours of the morning. Perhaps most significantly, Ethan had died. The questioning took on a much more accusatory tone; Bessler had already spoken to the other children present during the incident and believed there were things Hauschultz was not telling her. On the other hand, the interview appears to have been primarily motivated by a desire to gather information about whether the other children were safe in Timothy and Tonya's care—a purpose that is not indicative of custody.

¶72 A statement given during custodial interrogation in the absence of *Miranda* warnings is subject to the evidentiary penalty of suppression. *State v. Halverson*, 2021 WI 7, ¶14, 395 Wis. 2d 385, 953 N.W.2d 847. And indeed, that is the remedy Hauschultz seeks for all of the statements he made during the interviews. As set forth above, however, there was nothing constitutionally problematic with the circuit court's admissibility determinations regarding Hauschultz's statements during the first and second interviews. As a result, even if the third interview could be characterized as custodial, Hauschultz would be entitled to suppression only of the statements he made during that interview.

¶73 Faced with such a scenario—where the vast majority of statements a defendant made to law enforcement were properly deemed admissible but a small number of them present a difficult constitutional question—we turn to the doctrine of harmless error. *See State v. Dobbs*, 2020 WI 64, ¶¶67-68, 392 Wis. 2d 505, 945 N.W.2d 609. The parties have not addressed this precise situation; though their arguments touch on the harmless-error analysis, they take a collective all-or-nothing approach to the admissibility of statements made during the three interviews. Nonetheless, we have an independent obligation to assess harmless

26

error regardless of whether the parties do so. *State v. Harvey*, 2002 WI 93, ¶47 n.12, 254 Wis. 2d 442, 647 N.W.2d 189.

¶74    As set forth below, because we conclude any error in failing to suppress the statements Hauschultz made during the third interview would be harmless, we need not decide whether the court erred in that regard. *See State v. Castillo*, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) ("An appellate court should decide cases on the narrowest possible grounds.").

II.    *Plea Withdrawal/Harmless Error*

¶75    In *State v. Abbott*, 2020 WI App 25, ¶¶37-38, 392 Wis. 2d 232, 944 N.W.2d 8, we reinforced that harmless error is the appropriate test to use when a defendant has entered a guilty plea but prevailed on only a portion of the suppression issues he or she raised on appeal. Admitting statements in violation of *Miranda* is harmless error if there is no reasonable possibility that the error contributed to the conviction.[13] *See State v. Semrau*, 2000 WI App 54, ¶21, 233 Wis. 2d 508, 608 N.W.2d 376; *see also Dobbs*, 392 Wis. 2d 505, ¶68; *State v. Johnson*, 2012 WI App 21, ¶14, 339 Wis. 2d 421, 811 N.W.2d 441. In other words, we must assess whether the State has satisfied its burden to demonstrate that the suppression of Hauschultz's statements in the third interview would have changed his decision to plead guilty.

¶76    We easily conclude the harmless error standard is satisfied in this case. A failure to suppress evidence that is identical to other, admissible evidence

---

[13] The harmless error test has been formulated in other ways, though these formulations appear to require that essentially the same standard be met. *See State v. Abbott*, 2020 WI App 25, ¶47 & n.14, 392 Wis. 2d 232, 944 N.W.2d 8.

is harmless. *Abbott*, 392 Wis. 2d 232, ¶49. Hauschultz was extremely reluctant to speak during the third interview, having been advised by Timothy that it was not in his interest to do so. What little relevant information Hauschultz did offer was almost completely duplicative of the information he had presented during the earlier interviews—so much so that Bessler repeatedly suggested that there were significant details of the incident that he had omitted and urged him to fill in the gaps. Hauschultz did not waver in refusing to do so.

¶77 Indeed, we have difficulty identifying any new information that came during the third interview, let alone any information that would have had a bearing on Hauschultz's decision to plead guilty had he known of its inadmissibility. Hauschultz acknowledges this in his briefing, observing that the "substance of [his] statements during this [third] interrogation overlapped with those he'd made earlier." Hauschultz identifies only one, minor elaboration upon his earlier statements, which came when Hauschultz was confronted with the other children's claims that he had been standing on Ethan. Hauschultz denied standing on top of Ethan, but admitted that he had stepped on Ethan while he was giving him a "facewash."

¶78 We are confident beyond a reasonable doubt that the suppression of Hauschultz's statements during the third interview, even if warranted, would not have affected Hauschultz's decision to plead guilty to reckless homicide. Accordingly, there is no basis for the relief Hauschultz seeks: a reversal with instructions for the circuit court to grant plea withdrawal.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.